[No. B159949. Second Dist., Div. Six. Aug. 31, 2004.]

In re JESSE J. CALHOUN et al. on Habeas Corpus.

1318

COUNSEL

Jean F. Matulis, under appointment by the Court of Appeal, for Petitioners.

Bill Lockyer, Attorney General, Robert R. Anderson and James M. Humes, Assistant Attorneys General, John H. Sanders and Randall R. Murphy, Deputy Attorneys General, for Respondent.

OPINION

YEGAN, J.—Jesse J. Calhoun and Robert T. Simmons, petitioners in this habeas corpus proceeding, were found to be sexually violent predators (SVP's) pursuant to California's Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code, § 6600 et seq.)[1] They were committed to the State Department of Mental Health (Department) for appropriate treatment. They have been confined in Atascadero State Hospital (ASH). In 1997–1999, ASH personnel involuntarily medicated them with antipsychotic drugs, also known as psychotropic drugs.[2] Petitioners contend that, in the absence of an emergency, competent SVP's may not be involuntarily medicated with antipsychotic drugs. Petitioners also contend that they were involuntarily administered antipsychotic drugs for disciplinary purposes and to induce them to take other medications that they had refused.

In light of our Supreme Court's recent opinion in *In re Qawi* (2004) 32 Cal.4th 1 [7 Cal.Rptr.3d 780, 81 P.3d 224], we must conclude that SVP's have the same right to refuse antipsychotic drugs as mentally disordered offenders (MDO's) under the Mentally Disordered Offender Act (MDO Act). (Pen. Code, § 2960 et seq.) Accordingly, we hold that "an [SVP] can be compelled to take antipsychotic medication in a nonemergency situation only if a court, at the time the [SVP] is committed or recommitted, or in a separate proceeding, makes one of two findings: (1) that the [SVP] is incompetent or incapable of making decisions about his medical treatment; *or* (2) that the [SVP] is dangerous within the meaning of . . . section 5300. . . . The rights of [SVP's] to refuse medication can be further limited by State Department of Mental Health Regulations necessary to provide security for inpatient facilities." (*In re Qawi, supra,* 32 Cal.4th at pp. 9–10.) In all other respects, the petition is without merit and is denied.

---

[1] Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

[2] "Antipsychotic or psychotropic drugs are presently the primary tool for treatment of serious mental disorders . . . ." (*Department of Corrections v. Office of Admin. Hearings* (1997) 53 Cal.App.4th 780, 783, fn. 1 [61 Cal.Rptr.2d 903].)

## The SVPA

The SVPA "provides a court process by which certain convicted violent sex offenders, whose current mental disorders make them likely to reoffend if free, may be committed, at the end of their prison terms, for successive two-year periods of state hospital confinement and treatment as long as the disorder-related danger persists." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 893 [119 Cal.Rptr.2d 1, 44 P.3d 949].) In an uncodified statement of intent accompanying the SVPA, the Legislature declared that the purpose of the Act is to confine and treat "a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders" until "they no longer present a threat to society." (Stats. 1995, ch. 763, § 1, p. 5921.)[3]

To qualify as an SVP, a person must have "been convicted of a sexually violent offense against two or more victims" and must suffer from "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent [predatory] criminal behavior." (§ 6600, subd. (a)(1); *People v. Hurtado* (2002) 28 Cal.4th 1179, 1181–1182 [124 Cal.Rptr.2d 186, 52 P.3d 116].) " 'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody." (§ 6600, subd. (d).) It is likely that a person will engage in sexually violent predatory criminal behavior if "the person is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97], fn. omitted.)

A person alleged to be an SVP is "entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to

---

[3] The full uncodified statement reads as follows: "The Legislature finds and declares that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. The Legislature further finds and declares that it is in the interest of society to identify these individuals prior to the expiration of their terms of imprisonment. It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society.

"The Legislature further finds and declares that while these individuals have been duly punished for their criminal acts, they are, if adjudicated sexually violent predators, a continuing threat to society. The continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior. It is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes." (Stats. 1995, ch. 763, § 1, pp. 5921–5922.)

perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).) In a jury trial, a unanimous verdict is required. (§ 6603, subd. (f).) The trier of fact must find beyond a reasonable doubt that the SVP criteria have been met. (§ 6604.) The person is then committed to the "State Department of Mental Health for appropriate treatment and confinement in a secure facility . . . ." (§ 6604.) Thus, before an SVP is subjected to treatment and confinement, he is provided with procedural due process of law.

Irrespective of the SVP's amenability to treatment, the Department must provide "programming . . . which shall afford the person with treatment for his or her diagnosed mental disorder." (§ 6606, subds. (a) & (b).) "The programming . . . shall be consistent with current institutional standards for the treatment of sex offenders, and shall be based on a structured treatment protocol developed by the [Department]." (*Id.*, subd. (c).)

## Procedural Background

In March 1999 petitioners filed a petition for writ of habeas corpus in the California Supreme Court. Petitioners alleged that, in violation of their constitutional and statutory rights, they were being forcibly medicated with antipsychotic drugs absent a judicial determination of their competency to refuse such medication. The San Luis Obispo County Superior Court and this court had previously denied similar petitions. In May 2000 the California Supreme Court ordered the Director of the Department (respondent) to show cause before the superior court why the relief sought should not be granted.

In December 2000 the superior court conducted a hearing on the order to show cause. It denied the requested relief. In January 2001 Calhoun bypassed this court and filed a petition for writ of habeas corpus in the California Supreme Court.

In July 2002 the California Supreme Court ordered respondent to show cause before this court "why the relief sought should not granted on all issues raised within the petition, including but not limited to (1) whether medication, in particular Thorazine, was forcibly administered by staff to petitioners Calhoun and Simmons[4] at [ASH] for disciplinary, rather than therapeutic, purposes; (2) whether Thorazine was administered forcibly to induce petitioners' consent to the administration of Depakote, and if so, whether the staff should have administered Depakote in the first instance; (3) whether Thorazine was administered to petitioner Calhoun despite being medically contraindicated due to his liver disease; (4) whether the forcible administration of

---

[4] Although the January 2001 petition was filed only by Calhoun, the California Supreme Court considered both Calhoun and Simmons to be petitioners.

medication to petitioners was contrary to published policy or regulations of [ASH]; and (5) whether staff at [ASH] should have employed other, less intrusive means prior to the forcible adminstration of Thorazine."[5]

In its return, respondent alleged that "Calhoun was actually medicated without his consent for the first time on November 3, 1997 . . . ." On that date, Calhoun was injected with Thorazine. Respondent further alleged that "Simmons was administered medication [Thorazine] without his consent in two instances."

In their traverse, petitioners denied these allegations. Petitioners alleged that Calhoun "was routinely medicated without consent with Depakote and Mellaril both before and after November 3, 1997 . . . ." In addition, petitioners alleged that Simmons "was routinely medicated [with Depakote] on an involuntary basis under the threat of forcible [Thorazine] injection."

We appointed San Luis Obispo County Superior Court Judge Christopher G. Money as our referee to conduct an evidentiary hearing and make findings on eight questions.[6] The hearing lasted four days with 14 witnesses testifying. As to each petitioner, the following records of ASH were admitted in evidence: medication records, physicians' progress notes, physicians' orders, and interdisciplinary notes. Following the hearing, the parties filed

---

[5] The issuance of the order to show cause requires that we decide the issues on their merits. "When this court makes the writ or order to show cause returnable before a lower court, that court must decide the issues before it and 'dispose of . . . [the petitioner] as the justice of the case may require.' [Citation.]" (*In re Hochberg* (1970) 2 Cal.3d 870, 875–876, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1], disapproved on another ground in *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 3 [275 Cal.Rptr. 384, 800 P.2d 862]; see also *In re Orosco* (1978) 82 Cal.App.3d 924, 927 [147 Cal.Rptr. 463].)

[6] The questions were as follows: "(1) When was medication involuntarily administered to [petitioners] at [ASH]? On each occasion, what medication was involuntarily administered and how was it administered? Were petitioners involuntarily medicated with Depakote or Mellaril? [¶] (2) What were the circumstances leading to each involuntary medication of petitioners at ASH? What was the purpose of each involuntary medication? [¶] (3) Was medication involuntarily administered to petitioners at ASH only in emergency situations as defined in California Code of Regulations, title 9, section 853? [Fn. omitted.] [¶] (4) Was medication, in particular Thorazine, forcibly administered by staff to petitioners at ASH for disciplinary, rather than therapeutic purposes? [¶] (5) Was Thorazine forcibly administered to induce petitioners' consent to the administration of Depakote, and if so, should the staff have administered Depakote in the first instance? [¶] (6) Was Thorazine administered to Calhoun despite being medically counterindicated due to his liver disease? Has Calhoun been in liver failure at ASH? [¶] (7) Should staff at ASH have employed other, less intrusive means prior to the forcible administration of Thorazine to petitioners? What, if any, less intrusive means were available? If less intrusive means were available, why did ASH not employ them? Would they have been as effective and as safe as Thorazine? [¶] (8) What are the current treatment protocols for the involuntary medication of petitioners?"

responses to the eight questions. The referee subsequently filed his report and findings. Petitioners filed objections to the report and findings.

On October 29, 2003, we filed our opinion denying the petition for writ of habeas corpus. Our Supreme Court granted review and transferred the matter back to us "with directions to vacate [our] decision and to reconsider the cause in light of *In re Qawi* (2004) 32 Cal.4th 1 [7 Cal.Rptr.3d 780, 81 P.3d 224]."

*Facts—Calhoun*

On admission to ASH, Calhoun was diagnosed as suffering from a bipolar disorder and a personality disorder. Dr. Gabrielle Paladino was Calhoun's treating psychiatrist at ASH. Dr. Paladino declared: "A Bipolar Disorder (manic-depression) is a major mental illness which is a mood disorder. . . . [¶] The treatment for Bipolar Disorder includes the provision of psychotropic drugs."

According to Dr. Paladino, Calhoun had "periods of uncontrollable aggression and rage, where he had every bit the potential to harm himself and harm others." The cycles of violence were unpredictable. He "was considered to be extraordinarily dangerous with a lot of acting out in the California Department of Corrections." The "acting out" included "many assaults on staff, and even correctional officers . . . ." Dr. Paladino's "first introduction to Mr. Calhoun was when he was in the middle of a huge, pitched fight with a peer . . . ."

Prior to his confinement in ASH, Calhoun had been held in the security housing unit (SHU) at Pelican Bay State Prison. Dr. Paladino testified that the SHU is "reserved for the toughest, most criminally minded, acting out, dangerous inmates in the state."[7]

In 1997 Dr. Paladino prescribed Depakote for Calhoun because "at that time [it] was the gold standard for treating violence and aggression." She hoped that she "could get enough Depakote in him to calm him down a little bit so he wouldn't escalate into frank violence." Depakote is administered orally. It is not available in an injectable form.

---

[7] The SHU is "a place which, by design, imposes conditions far harsher than those anywhere else in the California prison system. The roughly 1,000–1,500 inmates confined in the SHU remain isolated in windowless cells for 22 and 1/2 hours each day, and are denied access to prison work programs and group exercise yards. Assignment to the SHU is not based on the inmate's underlying offense; rather, SHU cells are reserved for those inmates in the California prison system who become affiliated with a prison gang or commit serious disciplinary infractions once in prison." (*Madrid v. Gomez* (N.D.Cal. 1995) 889 F.Supp. 1146, 1155; see also *In re Collins* (2001) 86 Cal.App.4th 1176, 1179 [104 Cal.Rptr.2d 108].)

Calhoun declined to sign a consent form for Depakote. On July 23, 1997, he told Dr. Paladino that he would refuse to take Depakote because he did not need it. From August 7 through August 21, 1997, Calhoun regularly refused his daily Depakote medication. On August 21, 1997, Dr. Paladino discontinued the Depakote.

On October 15, 1997, Dr. Paladino ordered that Calhoun be restarted on Depakote because his behavior had become aggressive and hostile. He had threatened a nurse. Dr. Paladino's written order stated that Calhoun "must take medication." She directed that the Depakote be sprinkled in his applesauce. For each refused dose of Depakote, Dr. Paladino ordered that Calhoun receive an intramuscular injection of 50 milligrams of Thorazine.

An interdisciplinary note for October 15, 1997, reads as follows: "[Calhoun] came to med room . . . to rec[ei]ve 1st dose of [D]epakote sprinkles. . . . [Calhoun] stated[,] '[Y]ou're fucking [with] the wrong guy! Even [with] the shot I can get violent if I want to! It don't matter!' [Calhoun] took meds, and threw cup in trash very hard. Hands were trembling, [Calhoun] very angry."

In the morning on October 23, 1997, Calhoun threatened to cut off the heads of three staff members. Later that morning, Dr. Paladino increased the daily dose of Depakote and added Mellaril to Calhoun's medication regimen. Calhoun had declined to sign a consent form for Mellaril. Dr. Paladino ordered that he should receive an intramuscular injection of 100 milligrams of Thorazine for each refused dose of Mellaril. She also ordered that Calhoun receive, on an as-needed basis, an intramuscular injection of 50 milligrams of Thorazine for "acute agitation, fighting stance, threatening behavior."

Dr. Paladino testified that Thorazine was not supposed to be administered routinely whenever Calhoun refused his Depakote or Mellaril. Rather, she intended that it be given only "in an extreme emergency" when Calhoun "was in imminent danger of harming others or harming himself . . . ." The "staff were always to use their clinical judgment . . . regarding whether or not Mr. Calhoun was so out of control that he needed the Thorazine backup."

On the other hand, Dr. David Fennell, Acting Assistant Director of ASH, interpreted Dr. Paladino's backup order as requiring staff to "automatically" administer a Thorazine injection whenever Calhoun refused his medication. But Dr. Fennel's interpretation was based on his experience while assigned to the mentally disordered offender unit at ASH. He had never been assigned to the SVP unit.

Karen Von Geldern, a nurse who had worked with SVP's since 1996, testified that in 1997 staff "pretty much did as orders were written." However,

staff might not have forcibly administered Thorazine pursuant to a backup order if the patients "were stable enough that you didn't think they were going to blow, or they weren't already angry, refusing, and a danger to others at the time they're refusing."

On October 23, 1997, Dr. Paladino informed Calhoun of the changes in his medication orders. According to Dr. Paladino, he "angrily retorted that he was not going to take any medications at all." Calhoun said: "If you force medications on me, you're really going to see a side of me you won't like. This is intimidation."

Calhoun took his medications as ordered until November 3, 1997, when he threw his Depakote and Mellaril into the trash. Von Geldern informed him that he would receive a "backup" injection pursuant to Dr. Paladino's order. Calhoun yelled at staff that ASH "could not force him to take meds." He was "very, very angry." A staff member said to him, "I need to talk to you." Calhoun walked away stating, "I don't give a shit what you want." Calhoun was told that, if he refused to talk to staff, "assistance would have to be summoned." Calhoun assumed an "aggressive posture" and stated: "If you want to get aggressive, why don't you get aggressive now! . . . Try something now! Try it! I'll hurt you man!" "You can't force meds on me!"

Calhoun walked toward the staff's office. When he was less than six feet away, staff closed the office door. Calhoun turned and walked into the courtyard. Von Geldern wrote, "[Calhoun] left unit in attempt to avoid medication [and] confrontation."

In the courtyard, staff applied restraints to Calhoun. Calhoun said: "You'd better leave me in restraints forever." Von Geldern administered a 50-milligram intramuscular injection of Thorazine. Calhoun declared, "You're gonna have to do this every time. You're just gonna have to keep on forcing me until I go to court." After the injection was given, Calhoun threatened staff: "At least after you're dead you won't be able to do anything to me! As soon [as] I get out of here you're dead!"

After November 3, 1997, Calhoun regularly took Mellaril until December 30, 1997, when it was discontinued. He also regularly took Depakote until it was discontinued on January 28, 1998. After January 1998, neither Depakote nor Mellaril was administered to Calhoun.

A second forcible injection of Thorazine occurred on November 5, 1997. In the dining room on that date, Calhoun poured himself a 32-ounce cup of hot coffee. According to Dr. Paladino, ASH policy allowed patients only an eight-ounce cup "because staff have been badly burned by hot coffee thrown"

at them. Kevin Miller, a member of the staff, approached Calhoun and asked him to pour out the coffee. Calhoun became "belligerent" and "resistive." Miller reported: "He grabbed the cup away from staff [and] pulled it back appearing to be preparing to throw it at [them]." Staff grabbed Calhoun's arms and held him against a wall. Calhoun "became resistive." He was "agitated" and his voice was "loud to shouting." Staff placed Calhoun in wrist restraints and escorted him out of the dining room. Dr. Paladino spoke with Calhoun, and he was administered a 50-milligram intramuscular injection of Thorazine. Dr. Paladino testified that, two hours after the injection, Calhoun had calmed down to the point where staff "were able to get him out of restraints and get him back into the ward population."

A third and final forcible injection of Thorazine occurred on April 30, 1998. Calhoun became angry and agitated when a nurse did not immediately respond to his request for Tylenol for a headache. Calhoun yelled: "[T]hat bitch should have her head knocked off." Calhoun complained to Kevin Miller, who was at the nursing station. Miller testified that Calhoun had "pounded very loudly on the door, had a[n] . . . agitated look on his face, and was speaking very loudly." Miller opened the door and attempted to calm Calhoun down, but he "wouldn't even listen . . . . He was gesturing loudly—wildly . . . ." Calhoun made a "threatening statement" to Miller.

Miller asked Calhoun to go to "a quiet area," but he "refused adamantly." Miller "had more feedback that [Calhoun] was making threats to staff in general." A staff member who had been assigned to watch Calhoun "would periodically come in and say, he continues to be threatening and loud in the dayroom." Because of the threats to staff, Miller decided to restrain Calhoun. After a struggle, staff placed him in wrist restraints.

Staff escorted Calhoun to "the quiet room," where they tried to strap him to a chair. Calhoun struggled and "was verbally very belligerent the whole time . . . ." A nurse walked in with a syringe, and Calhoun "just went berserk." He struggled and started kicking. He almost kicked Miller in the face. Two other staff members were kicked: one in the stomach and the other in the face.

At Dr. Paladino's direction, Calhoun was placed in full bed restraints and given an injection of Thorazine. Paladino believed that a "psychiatric emergency" had occurred, and she "wanted something that would stop this now without hurting him . . . ."

Since April 30, 1998, Calhoun has not been involuntarily medicated.

### Facts—Simmons

On admission to ASH, Simmons was diagnosed as suffering from attention deficit/hyperactivity disorder and antisocial personality disorder. Dr. Paladino

was his treating psychiatrist at ASH. She diagnosed him as also suffering from "a mood disorder, which is probably schizo[-]affective disorder . . . ." The combination of disorders made him "very prone to impulsivity."

On April 13, 1998, Simmons asked staff to place him in full bed restraints. He said he was "going off" and "would hurt someone" if he were not restrained. He refused his medications. Simmons was placed in full bed restraints. After several hours, he stated that he was "still dangerous" and not ready to be released.

The following morning, Simmons said that he would not harm himself or others if he were released. He agreed to take his medications. Staff removed the restraints.

Simmons signed a consent form for Depakote. On April 16, 1998, Dr. Paladino wrote: "[Simmons] admitted having racing thoughts & mood swings leading to impulsive behavior. He endorses starting [D]epakote . . . ."

Except for one refusal, Simmons regularly took Depakote from April 16 through May 12, 1998. On May 11, 1998, Dr. Paladino noted, "Simmons stated he feels the Depakote has been very helpful."

On May 13, 1998, Simmons refused all medications. Dr. Paladino ordered that he could not refuse Depakote. She further ordered that, for each refused dose of Depakote, Simmons should receive an intramuscular injection of 25 milligrams of Thorazine. Dr. Paladino gave the following explanation for the Thorazine backup order: ". . . [Simmons] tended within moments to switch his opinion about things and would enthusiastically want medications for days and weeks, and all of a sudden, for no reason, [say, ']I don't want to take it.['] That's all fine, but then he would also have these episodes where he would threaten violence within the institution and create a great deal of disruption that I thought was dangerous to the safety of the hospital . . . ." The backup order was "in place, so that . . . if an emergency situation developed with Mr. Simmons, he [would be] able to be medicated and calm[ed] . . . as quickly as possible."

John Sosa, a staff member who worked on the SVP unit in 1996–1998, testified that staff were not required to "automatically" administer a backup injection of Thorazine every time Simmons refused Depakote: "[I]t was a situation-by-situation basis, and we didn't feel I.M.[']s [intramuscular injections] were necessary until at such a point as Mr. Simmons . . . had lost control of himself or presented a danger to himself or others . . . ."

On May 13, 1998, Simmons was informed of the Thorazine backup order. Dr. Paladadino wrote in her notes: "He was . . . told by team that he is

required to take the Depakote for his mood lability; refusals will be met with an IM [intramuscular] Thorazine backup." Simmons said he planned to refuse medications on the following day "so they force the shot on me [and] then I can say they forced me to take treatment that I don't want." Pursuant to his request, Simmons was given a complaint form. He voiced "anger" about "being on Depakote."

After Dr. Paladino's backup order, Simmons took his daily Depakote dose until May 27, 1998, when he refused. Simmons's medical records show that on that date he was given an intramusucular injection of 25 milligrams of Thorazine "for refused dose of [D]epakote." The records state that the injection was "effective."

Following the injection, Simmons regularly took Depakote until September 17, 1998, when he received a second intramuscular injection of 25 milligrams of Thorazine. An entry in ASH's interdisciplinary notes for that date reads: "Refusing all A[.]M[.] meds & knew he is to receive chlorpromazine [generic name for Thorazine] IM for this. He was cooperative & business like in his interaction & as he left stated[,] 'Please make sure you have more because I am going to continue to refuse.' He would give no explanation for his action." Several hours after the injection, Dr. Paladino ordered that the Depakote be discontinued. She doubled the daily dosage of Pemoline, which Simmons had been taking pursuant to his written consent since September 10, 1998.

On October 8, 1998, Dr. Paladino stopped the Pemoline because Simmons complained that it was "making him jittery." On October 26, 1998, Simmons warned staff that "he will have to be put in restraints in the near future because he will 'go off.' "

On October 28, 1998, Simmons was placed in wrist restraints after stating that he needed to be restrained to ensure the safety of others. Simmons told staff that he "will do whatever it takes to get off of this ward. If that means hurting someone, then it means hurting someone. . . . Even if it means a third strike." Simmons was transferred to another ward and placed in seclusion.

On October 29, 1998, Simmons "continue[d] to be unwilling to contract not to harm others" and refused to eat. According to an interdisciplinary note, he "agreed [with] unit psychiatrist to rec[ei]ve medications." Dr. Paladino ordered that Simmons be given a Thorazine injection as needed for "agitation." She also ordered that Simmons be given Depakote on a daily basis and that he "may not refuse" the medication. In addition, for the next three days, she ordered that Simmons be given a Thorazine injection for each refused dose of Depakote.

On October 29, 1998, for the first time since September 16, 1998, Simmons took Depakote. Simmons said, "I'm going to give the medications a chance to work."

The Thorazine backup order was discontinued on November 1, 1998. On November 4, 1998, a staff member wrote: "[Simmons] has resumed meds that are needed and he is more compliant [with] unit rules and making no more threats[.]" On December 4, 1998, Dr. Paladino reported: "[Simmons] is agreeable to increasing the VPA [Depakote], telling this writer he 'knows' he needs medication." On February 8, 1999, Simmons remarked, "I've been doing well on Depakote."

On May 26, 1999, Simmons said "he had been experiencing 'mood swings' and feelings of wanting to act out physically in a harmful way toward peers who anger him." On May 31, 1999, Simmons was "threatening to 'pop' a peer." On June 1, 1999, Simmons reported "feeling emotionally labile and at risk of acting out physically." He said he "felt so stressed out he feels like hitting a peer who has been annoying him."

In the early morning on June 2, 1999, Simmons initially refused his medications, "but after staff insisted he took them . . . ." Simmons said that staff were going to have to give him an injection because he was going to refuse his "noon meds." An interdisciplinary note for 5:40 p.m. stated that Simmons was "very tense [with] clenched teeth, pressured speech, threats of harming peers." According to the note, he had refused Depakote.

On June 3, 1999, Dr. Paladino increased Simmons's daily Depakote dose. She ordered that Simmons be given a Thorazine injection for each refused dose of Depakote. This was the first Thorazine backup order since the previous one had been discontinued on November 1, 1998.

An interdisciplinary note for 7:00 p.m. on June 3, 1999, states that Simmons complained "he was having trouble controlling his anger and was afraid he was going to 'go off' on someone if he didn't get something to help him calm down." Simmons was given 100 milligrams of hydroxyzine.

Later that same evening, Simmons became "upset" when he was informed that Dr. Paladino had increased the Depakote dosage. He took the Depakote, "but made several statements and threats, i.e. 'You write down that I'm not taking no meds no more. I'm sick of this shit. . . . I want to see a court order that I can't refuse meds. I'm going to do something. I'll be in restraints before this night is over. You guys will have to put me in restraints til I leave here. I'm not taking no more meds.' "

On June 4, 1999, Simmons refused his morning dose of Depakote. His medication records note that, upon refusing, he stated, "I want my IM."

Simmons received an intramuscular injection of 25 milligrams of Thorazine. This was the third and final Thorazine injection administered to him at ASH.

The last medication order in the record is dated June 18, 1999. It does not authorize a Thorazine injection for refusal to take Depakote. An interdisciplinary note for June 18, 1999, states that Simmons "has decided to refuse meds until court decision made or he reconsiders." From June 19 through July 14, 1999, Simmons refused Depakote on several occasions but was not given a Thorazine injection.

## Standard of Review

A habeas corpus petitioner " ' "must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]" ' [Citations.] ' "The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence." ' [Citation.] 'Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying. [Citations.] On the other hand, any conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review. [Citation.]' . . . [Citation.]" (*In re Cox* (2003) 30 Cal.4th 974, 998 [135 Cal.Rptr.2d 315, 70 P.3d 313].)

## Petitioners Were Involuntarily Medicated

"Involuntary medication" has been defined as " 'the administration of any psychotropic, psychoactive, or antipsychotic medication or drug to any person by the use of force, discipline, or restraint,' or the administration of any such medication or drug to a person who does not give informed consent." (*Department of Corrections v. Office of Administrative Hearings* (1998) 66 Cal.App.4th 1100, 1103 [78 Cal.Rptr.2d 473].) The referee found that "Depakote and Mellaril were not involuntarily administered to petitioners."

Insofar as this finding applies to Calhoun, we disagree. The finding is inconsistent with the referee's other findings that the Thorazine backup order "may have induced [Calhoun] to take Depakote or Mellaril" and "may have been coercive . . . ." Moreover, the record establishes that these drugs were involuntarily administered to Calhoun. He refused to sign a consent form for Depakote or Mellaril. According to Dr. Paladino, "he verbally did indicate to [her] that he would try [Depakote], and then he would change his mind, and he would go back to it, and then finally he changed his mind entirely and said no, no more Depakote." Despite his refusal, Dr. Paladino continued to prescribe Depakote for Calhoun,ordered that he must take it, and further

ordered that he be given a Thorazine injection for each refused dose. She also prescribed Mellaril with a Thorazine backup order. Calhoun testified that, after the Thorazine backup order, "for the most part" he took Depakote and Mellaril because he "felt coerced." Calhoun explained: "If I didn't [take the medications], I'd get the Thorazine, and I didn't want to get shot up with Thorazine."

On the other hand, we adopt the referee's factual finding that Simmons was not involuntarily medicated with Depakote. This finding is supported by substantial evidence. Unlike Calhoun, Simmons signed a consent form for Depakote. Simmons took Depakote when he wanted it and refused Depakote when he did not want it.

In the traverse, Simmons alleged that he "was routinely medicated on an involuntary basis [with Depakote] under the threat of forcible [Thorazine] injection." But at the evidentiary hearing Simmons testified that, in deciding whether to take Depakote, he was not influenced by Dr. Paladino's order that he be injected with Thorazine if he refused the medication. The injections did not make him "feel more pressure to take the Depakote[.]" Simmons continued to take Depakote for several months after the Thorazine backup order was discontinued on November 1, 1998.

The referee found that Calhoun had been involuntarily medicated with Thorazine on three occasions. The referee made a contrary finding as to Simmons: "Mr. Simmons was not involuntarily or forcibly medicated. On two occasions he did refuse Depakote and asked to be given an injection of Thorazine. On the third occasion the record simply states that he refused Depakote and was injected with Thorazine. Dr. Paladino testified he asked for the injections because he enjoyed them. It is clear from the testimony that he was not physically forced to submit to an injection but did so as an alternative to taking Depakote."

We adopt the referee's finding that Calhoun was involuntarily medicated with Thorazine. We disagree with the finding that Simmons was not involuntarily medicated. Simmons did not choose to receive a Thorazine injection on the three occasions in question. The records from ASH show that Simmons submitted to the Thorazine injections because he believed he had no choice in the matter if he refused Depakote. On May 13, 1998, Simmons told staff that he planned to refuse medications on the following day "so they force the shot on me [and] then I can say they forced me to take treatment that I don't want." The day before the final injection on June 4, 1999, Simmons stated that he was "taking no more meds" and demanded "to see a court order that he can't refuse meds."

At the evidentiary hearing, Simmons denied that he had derived pleasure from receiving the Thorazine injections. Simmons testified: ". . . I told them to go ahead and give me the injection because I was not going to take my medication [Depakote], I didn't want to take it." "I didn't want the shot." "But that was the only alternative they were giving me." Simmons said he "felt so strongly about not taking the Depakote that [he was] even willing to get a shot[.]"

Although Dr. Paladino's testimony at the evidentiary hearing supports the referee's finding that Simmons was not involuntarily medicated with Thorazine, her testimony conflicts with her declaration that was attached to the return.[8] In the declaration, Dr. Paladino stated that on two occasions Simmons was administered Thorazine "without his consent." She also stated that Simmons had "refused to consent to the drug Chlorpromazine [Thorazine]." Furthermore, in the return respondent admitted that Simmons was administered Thorazine "without his consent in two instances."[9]

*Medication Involuntarily Administered in Nonemergencies*

Section 5008, subdivision (m), of the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.) defines "emergency" as "a situation in which action to impose treatment over the person's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first gain consent. It is not necessary for harm to take place or become unavoidable prior to treatment." The Department's published regulations give a more restrictive definition of "emergency": "An emergency exists *when there is a sudden marked change in the patient's condition* so that action is immediately necessary for the preservation of the life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first obtain consent." (Cal. Code Regs., tit. 9, § 853, italics added.) Section 5332, subdivision (e), provides that in emergencies certain LPS patients may be involuntarily medicated with antipsychotic medication prior to a capacity hearing.

---

[8] Dr. Paladino opined that Simmons's purpose in refusing Depakote was "to get injectable medications." She testified that on two occasions he "verbally consented" to the injections: "[H]e would very calmly lift up his shirt and say, here, give me the shot, give me the shot . . . ." "[G]o ahead and give it to me, I want it." Dr. Paladino said Simmons told her "that he preferred receiving his medications via injection" and "that he liked the feeling of the injection." Dr. Paladino opined that Simmons had "a long history of seeking pain" and had sought the injections because he enjoyed them.

[9] Respondent claimed that the third Thorazine injection on June 4, 1999, was administered with Simmons's consent because he had stated, "I want my IM," after refusing Depakote. In his points and authorities in support of the return, respondent alleged: "Petitioner Simmons was involuntarily medicated on May 27, 1997 [1998], and September 17, 1998. . . . Petitioner Simmons was also medicated with an injection of Chlorpromazine [Thorazine] at his request on other occasions."

Respondent contends that medication was involuntarily administered to petitioners only in emergencies. The referee found that Calhoun's three forcible Thorazine injections were justified by emergencies.

Calhoun was regularly involuntarily medicated with Depakote and Mellaril in the absence of an emergency. Although Calhoun's second and third Thorazine injections may have been justified by true emergencies, the first was not. The first injection was administered after Calhoun had thrown his Depakote and Mellaril into the trash. An interdisciplinary note states, "[Calhoun] given IM Thorazine back up for refused Rx." Calhoun's refusal to take his medications did not constitute an emergency. He did not become hostile or threatening until staff informed him that they were going to forcibly inject him with Thorazine pursuant to Dr. Paladino's backup order. Calhoun's aggression was directed at preventing the forcible medication.

On all three occasions, Simmons was involuntarily medicated with Thorazine in nonemergency situations. Staff at ASH administered Thorazine because he had refused to take Depakote, not because the injections were immediately necessary to prevent serious bodily harm to himself or others. In her declaration attached to the return, Dr. Paladino stated that Simmons received the first and second Thorazine injections "for refusal of his regular Depakote."

*Medication Administered for Therapeutic Purposes, Not for Discipline or to Induce Consent to Depakote*

The referee found that medication at ASH "is given for treatment" and that "[n]o medication was administered to petitioners for disciplinary rather than therapeutic purposes." The referee also found that "Thorazine was not forcibly administered to induce petitioners' consent to take Depakote," and that "Thorazine was only forcibly administered to Mr. Calhoun to alleviate psychiatric symptoms that were causing his agitation and his violent outbursts." Substantial evidence supports these factual findings, which we adopt.

Dr. Paladino testified that, at the time she prescribed Depakote, it was "the gold standard for treating violence and aggression." She prescribed Mellaril for Calhoun "to decrease the symptoms of aggression . . . ." The purpose of the Thorazine injections "was to calm the individuals down and restore their stability in a psychiatric sense." Dr. Paladino opined that Thorazine "has a very well recognized use in the treatment of mood instability and related behavior as an adjunct to mood-stabilizing agents." She "used the Thorazine because Depakote is not available in the injectable form."

Dr. Fennell testified that the reason for the Thorazine "backup is we're treating a psychiatric illness, and if the patient is not taking the prescribed

oral medication, he needs to receive, unfortunately, second best treatment." Depakote is "a drug of choice" for treatment of bipolar disorder, but Thorazine "has some beneficial effect . . . ." Thorazine "treats the agitation, the thought disorganization, and the flight of ideas, lack of sleep." "It treats the underlying psychosis, it's an antipsychotic, and it has a . . . benefit of being somewhat sedating . . . . [¶] . . . [T]horazine . . . helps dissolve the underlying psychosis, which is . . . of the utmost importance because it treats the underlying illness."

Dr. Robert Knapp, Medical Director of ASH, declared: "Chlorpromazine [Thorazine] is one of the preferable medications for treatment of acute, short term use in the management of dangerous states of agitation because Chlorpromazine's side and after effects are less severe than other medications used to treat acute dangerous psychotic episodes."

Dr. Charles Davis, an expert in the psychiatric care of sexually violent offenders, opined that Thorazine was administered "to basically replace the Depakote that was refused. . . . [I]t was being used to attempt to support . . . the participation in the treatment program." Dr. Davis noted that the Thorazine was administered "in small doses." He testified that, "in small doses, it's very good at calming irritability and supporting a treatment program."[10]

### The Administration of Thorazine and Depakote Was Not Medically Contraindicated by Calhoun's Liver Disease

Calhoun had hepatitis C, a viral infection of the liver. The referee found that the administration of Thorazine was not medically contraindicated by Calhoun's liver disease. We adopt this factual finding, which is supported by substantial evidence. Dr. Fennell testified that Thorazine is generally not contraindicated unless a patient with hepatitis C is in liver failure. Calhoun admits that he was not in liver failure at ASH. According to Dr. Knapp, Thorazine "is not contraindicated in liver disease of the type and extent present in [] Calhoun." Dr. Paladino testified that Thorazine is "not specifically contraindicated, especially when Thorazine is only going to be used as a one shot or very infrequent situation." "A one shot through the liver, one pass through the liver is not going to materially harm it because it's just so fleeting . . . ."

The referee was not asked to find, and did not find, whether Depakote was medically contraindicated by Calhoun's liver disease. This issue was not

---

[10] At oral argument, respondent stressed that the use of antipsychotic drugs, here Thorazine, has a calming effect upon the patient which enables him to meaningfully participate in sex offender treatment programs at ASH. This theory is supported by the record and refutes petitioners' contention that these drugs do not target the underlying cause of the SVP commitment.

raised in the Supreme Court's order to show cause. Dr. Paladino testified that Depakote can cause the elevation of liver enzymes in patients with hepatitis C. An elevation of liver enzymes indicates that the liver has become more inflamed.

Depakote was also not medically contraindicated. Dr. William Kocsis, an internist at ASH, testified: "We treat many patients in our institution who have abnormal liver enzymes who have hepatitis C with Depakote. As long as the psychiatrist monitors the liver enzymes and make[s] sure they don't go very high, it's not unreasonable."

Dr. Paladino monitored Calhoun's liver enzymes. On January 12, 1998, his liver enzymes increased to four times normal. According to Dr. Kocsis, this was not a dangerous level. Dr. Paladino "could have continued the Depakote for a while and monitored his liver enzymes closely." Out of an abundance of caution, Dr. Paladino gradually decreased the dosage of Depakote and discontinued it on January 28, 1998. In mid-April 1998, Calhoun's liver enzymes returned to normal.

### Staff Were Warranted in Not Employing Other, Less Intrusive Means Prior to the Forcible Administration of Thorazine
### Calhoun

The referee concluded that there were no less intrusive means that staff at ASH should have employed prior to the forcible administration of Thorazine to Calhoun: ". . . Mr. Calhoun's aggressive, violent and uncontrolled behavior either made the attempt to use less restrictive means ineffective or the circumstances prevented their application." This is a mixed question of law and fact that we independently determine. We conclude that staff were warranted in not employing less intrusive means.

Calhoun argues that, on November 3, 1997, staff should have "respected" his "informed decision as to whether to take Depakote and Mellaril . . . ." But had staff handled the situation in this manner, it would not have been treating his mental disorder. Instead, it would have allowed him to avoid treatment. Calhoun had made death threats to staff on October 23, 1997, only 11 days earlier. Thus, it was especially important that he be treated with antipsychotic drugs at this time. Depakote was the drug of choice, but it was not available in an injectable form.

Calhoun contends that staff should have employed less intrusive means on the two other occasions when he was forcibly medicated with Thorazine. He characterizes the incident of November 5, 1997, as involving no more than a violation of a "coffee cup rule." Calhoun argues: " [T]here are many ways of

enforcing rules in institutions without resorting to physical confrontation, such as counseling the person, recommending fewer privileges and/or lowering hall pass status." Calhoun asserts that, on April 30, 1998, staff should have given him a Tylenol and "allow[ed him] to go to breakfast with his peers."

Calhoun ignores his serious threats of violence during these two incidents. On November 5, 1997, he threatened to throw hot coffee at staff. On April 30, 1998, Calhoun became extremely belligerent and agitated after a nurse did not immediately respond to his request for Tylenol. He threatened the nurse and the staff in general.

Because of his threats, on both occasions it was necessary to restrain Calhoun to protect staff. Keeping him in restraints for an extended period of time was not necessarily less intrusive than forcibly medicating him with Thorazine. Dr. Paladino testified that, "in terms of what is more intrusive to the patient, it's being put in full-bed restraints for hours on end, rather than getting a one-time injection . . . ." "[W]e tried very hard to keep [Calhoun] out of restraints. . . ."

Dr. Fennell testified that mechanical restraints are "extremely restrictive" and "can have a lot of medical contraindications which could be dangerous to the patient." According to Dr. Fennell, full bed restraints are considered to be the most restrictive means of controlling agitated patients.

Furthermore, restraining Calhoun without administering antipsychotic drugs would not have provided treatment for his mental disorder. As Dr. Fennell explained, "We're not talking about just having somebody who's upset and calming down. . . . We're talking about a behavior that's driven by a psychosis, and just tying the person up and leaving them there . . . would be neglectful of treating his underlying illness."

The United States Supreme Court has expressed skepticism concerning the use of physical restraints as an alternative to antipsychotic drugs for dangerous inmates who suffer from serious mental illnesses: "Physical restraints are effective only in the short term, and can have serious physical side effects when used on a resisting inmate [citation] as well as leaving the staff at risk of injury while putting the restraints on or tending to the inmate who is in them." (*Washington v. Harper* (1990) 494 U.S. 210, 226–227 [108 L.Ed.2d 178, 110 S.Ct. 1028].)

Accordingly, there were no other, less intrusive means that staff should have employed prior to forcibly administering Thorazine to Calhoun.

Because the referee found that Simmons had not been forcibly medicated with Thorazine, he did not find whether staff should have employed other, less intrusive means prior to forcibly medicating him. We conclude that, in Simmons's case, staff were also warranted in not employing less intrusive means.

The record establishes that antipsychotic medication was required to treat Simmons's mental disorders and control his violent propensities. When Simmons refused Depakote, a substitute medication was necessary. Although Thorazine was not as beneficial as Depakote, it still provided treatment for Simmons's psychiatric illness. Moreover, the Thorazine injections were minimally intrusive because they were administered without using physical force or restraints. Unlike Calhoun, Simmons cooperated with staff and did not resist. On June 4, 1998, Simmons asked for a Thorazine injection after refusing Depakote. In addition, the Thorazine was administered in small (25 milligram) doses. Dr. Davis testified that "the dose is absolutely related to the level of intrusiveness" and that "in small doses, Thorazine is not an intrusive medication."

### The Forcible Administration of Thorazine Was Not Contrary to ASH's Published Policy

When Calhoun was forcibly medicated, ASH's published policy concerning medication for all commitments was set forth in Medical/Nursing Services Administrative Directive No. 516, effective August 6, 1997. The directive, published in the ASH Operating Manual, was also in effect when Simmons was injected with Thorazine on May 27, 1998. The directive did not expressly refer to patients committed under the SVPA. However, section II.B.1 of the directive impliedly authorized the involuntary medication of SVP's in nonemergencies without court authorization, so long as the medication was prescribed for treatment purposes. Section II.B.1 provided: "Any prescriber who has privileges in General Psychiatry is authorized to prescribe psychiatric treatment, including medication, for a non-consenting patient who is: [¶] [] Committed to the hospital by a court order for such treatment (PC 1370, PC 1026 , 6316 W & I)[.]"

■ Section II.B.1 expressly referred only to Penal Code sections 1370 (defendant found mentally incompetent) and 1026 (defendant found not guilty by reason of insanity) and former Welfare and Institutions Code section 6316

(defendant found to be mentally disordered sex offender (MDSO)).[11] However, we do not construe section II.B.1 as applying exclusively to persons committed under these statutes. SVP's are also judicially committed to ASH for psychiatric treatment. (§ 6604.) ■ The SVPA requires the Department to "afford the [SVP] with treatment for his or her diagnosed mental disorder." (§ 6606, subd. (a).) An SVP is similarly situated to an MDSO committed for treatment under former section 6316. "An SVPA commitment unquestionably involves a deprivation of liberty, and a lasting stigma, equivalent to a commitment under the former MDSO law . . . ." (*People v. Hurtado, supra,* 28 Cal.4th at p. 1194.) Former section 6300 defined an MDSO as "any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." It would have been absurd for ASH to have authorized the involuntary medication of MDSO's but to have forbidden the involuntary medication of SVP's. There was greater justification to involuntarily medicate SVP's since, unlike MDSO's, SVP's must have violent propensities.

If any doubt existed whether section II.B.1 was intended to encompass SVP's, the issue was explicitly clarified by ASH's modification of the section, effective August 18, 1998. As modified, the section expressly authorized the medication for treatment purposes of nonconsenting patients committed under the SVPA.[12] An exception was made for SVP's who had not yet had a probable cause hearing. (§ 6602.) They could "not be forced to take psychotropic medication absent a psychiatric emergency . . . ." (Adm. Dir. No. 516 (Aug. 18, 1998) § II.C.3.)[13] The modification was in effect when Thorazine was administered to Simmons on September 17, 1998, and June 4, 1999.

---

[11] The MDSO statutes (former § 6300 et seq.) provided a civil commitment procedure for MDSO's. (*People v. Green* (2000) 79 Cal.App.4th 921, 925 [94 Cal.Rptr.2d 355].) The statutes were repealed effective January 1, 1982. (Stats. 1981, ch. 928, § 2, p. 3485.)

[12] As modified effective August 18, 1998, section II.B.1 provided: "Any prescriber who has privileges in General Psychiatry is authorized to prescribe psychiatric treatment, including medication, for a non-consenting patient who is: [¶] [] Committed to the hospital by a court order for such treatment (PC 1370, PC 1026, W&I 6316, W&I 6602, and W&I 6604)." Sections 6602 and 6604 are part of the SVPA.

[13] Section II.C.3 of Administrative Directive No. 516, as modified effective August 18, 1998, provided: "Patients committed under [§] 6600 et. seq., prior to a probable cause hearing, may not be forced to take psychotropic medication absent a psychiatric emergency, which means endangering the health and safety of the patient or others as a consequence of the patient having a mental disease, disorder, or defect. Voluntary informed consent should be obtained prior to administering psychotropic medication whenever possible. In a psychiatric emergency, the attending psychiatrist may order appropriate medication for the emergency situation only. A [§] 5150 (LPS) hold must be initiated immediately and a '*Riese*' competency hearing must be scheduled through Forensic Services."

Our interpretation of ASH's published policy is supported by the uncontradicted testimony of Dr. Fennell: "[ASH's] policy in 1997 was that [section] 6600 commitments would be treated—and I'm going to use an analogous situation—as [Penal Code sections] 1370[']s and 2962[']s, in which they can be medicated involuntarily under . . . the admit order.[14] Our understanding of the law at that time was they were committed for treatment, and so we did not see a contradiction." "[O]ne of the mainstays of treatment is antipsychotic or psychotropic medications."

Petitioners were forcibly medicated with Thorazine for therapeutic reasons after they had been found to be SVP's and had been committed to ASH for appropriate treatment. Accordingly, ASH's published policy was not violated.

ASH's published policy has changed dramatically since the involuntary medication of petitioners in 1997–1999. Administrative Directive No. 516.2, effective January 22, 2002, presently applies to the involuntary medication of SVP's. Under section II.A. of the directive, ASH is precluded from involuntarily medicating petitioners with psychotropic drugs absent an emergency or court authorization. Section II.A. provides: "Until a Superior Court order is issued authorizing involuntary psychotropic medication, the patient may be medicated only in the event of an emergency, and only for as long as the emergency exists. . . ." The record contains no evidence that ASH has violated Administrative Directive No. 516.2. The referee found that petitioners' current treatment protocols comply with the directive.

### The SVPA Impliedly Denies Competent SVP's the Right to Refuse Antipsychotic Medication in Nonemergencies

Petitioners contend that the SVPA does not permit the involuntary treatment of competent SVP's with antipsychotic drugs in nonemergencies. We disagree. Pursuant to legislative mandate, the Department is required to afford appropriate treatment to SVP's. (§§ 6604, 6606, subd. (a).) This requirement, together with section 6606, subdivision (b), impliedly denies competent SVP's the right to refuse antipsychotic medication in nonemergencies. Section 6606, subdivision (b), provides: "Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, *nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program.*" (Italics added.) The implication of the italicized language is that competent SVP's who do not recognize their problems and are

---

[14] Penal Code section 2962 applies to MDO's required to be treated by the Department as a condition of parole. Section II.B.2. of Administrative Directive No. 516, effective August 6, 1997, permitted the involuntary medication of MDO's admitted to ASH pursuant to Penal Code section 2962.

unwilling to participate in treatment programs may be compelled to participate. There is no legislative preclusion of a treatment regimen that includes the involuntary administration of antipsychotic medication. As Dr. Fennell testified, "one of the mainstays of treatment is antipsychotic or psychotropic medications."

State prisoners, LPS patients, and MDO's, unlike SVP's, have a statutory right to refuse antipsychotic medication. The statutes granting that right are distinguishable from the SVPA.

*State Prisoners*

In *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 530 [223 Cal.Rptr. 746], the appellate court held that state prison inmates "have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so." The holding was based on former Penal Code section 2600, which provided: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." The *Keyhea* court noted that "nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so." (*Keyhea v. Rushen, supra*, 178 Cal.App.3d at p. 541, fn. omitted.) The court concluded that, under former Penal Code section 2600, prisoners are entitled to the same right because denial of the right is not necessary to prison security. (*Id.*, at p. 542.) The SVPA contains no provision which, like former Penal Code section 2600, limits the extent to which SVP's may be deprived of rights.

The litigation in *Keyhea* led to the issuance of a permanent injunction filed in the superior court on August 31, 1986.[15] Pursuant to the injunction, a state prisoner cannot be involuntarily medicated with antipsychotic drugs for more than three days unless the prisoner is found, as a result of a mental disorder, to be (1) gravely disabled and incompetent to refuse medication, or (2) a danger to others, or (3) a danger to self. (*Keyhea* injunction, §§ II (A.1.b.), p. 6, II (M.3.), p.13, III (F.), p. 18.) The injunction defines "danger to others" "in substantial accord with Welfare and Insitutions Code § 5300." (*Id.*, § I (4.), p. 4.) "A prisoner will be considered a danger to others only if he or she

---

[15] The injunction may be found on the Web site of the California Department of General Services, Office of Administrative Hearings (Order Granting Plaintiff's Motion for Clarification and Modification of Injunction and Permanent Injunction, *Keyhea v. Rushen* (Super. Ct. Solano County, Oct. 31, 1986, No. 67432) <http://www.oah.dgs.ca.gov/laws/keyhea.asp> [as of Aug. 31, 2004].)

has attempted, inflicted or made a serious threat of 'substantial physical harm upon the person of another' either after being taken into custody or as the cause of being taken into custody, as specified in section 5300, and 'presents, as a result of mental disorder, demonstrated danger of inflicting substantial physical harm upon others.' " (*In re Qawi, supra,* 32 Cal.4th at p. 22, quoting from the *Keyhea* injunction, § I (4.b) p. 4.)

In 1994 Penal Code section 2600 was amended to provide that a state prisoner "may . . . be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests." (Stats. 1994, ch. 555, § 1, p. 2821.) The amendment incorporated the *Keyhea* injunction: "Nothing in this section shall be construed to permit the involuntary administration of psychotropic medication unless the process specified in the permanent injunction, dated October 31, 1986, in the matter of *Keyhea v. Rushen,* 178 Cal.App.3d 526 [223 Cal.Rptr. 746], has been followed." (Pen. Code, § 2600.) As a result of the 1994 amendment, the *Keyhea* injunction now "has the force of statutory law." (*In re Qawi, supra,* 32 Cal.4th at p. 22.) Accordingly, state prisoners, unlike SVP's, have a statutory right to refuse antipsychotic medication in the absence of compliance with the *Keyhea* injunction.

### LPS Patients

In *Riese v. St. Mary's Hospital and Medical Center* (1987) 209 Cal.App.3d 1303 [271 Cal.Rptr. 199], the appellate court held that psychiatric patients involuntarily committed to mental health facilities under sections 5150 and 5250 of the LPS Act "have statutory rights to exercise informed consent to the use of antipsychotic drugs in nonemergency situations absent a judicial determination of their incapacity to make treatment decisions . . . ." (At p. 1308.) The holding was primarily based on statutes providing that, except as specifically stated, patients committed under the LPS Act have the same rights as other persons: "Section 5005 provides that '*Unless specifically stated,* a person [detained under] the provisions of this part shall not forfeit any legal right or suffer legal disability by reason of the provisions of this part.' (Italics added.) Similarly, section 5325.1 commences with the definitive statement that 'Persons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California *unless specifically limited by federal or state law or regulations.*' (Italics added.) Finally, section 5327 specifies that 'Every person involuntarily detained under provisions of this part . . . shall be entitled to all rights set forth in this part and *shall retain all rights not specifically denied him under this part.*' (Italics added.)" (*Id.,* at p. 1317.) The *Riese* court concluded that, since the LPS Act does not explicitly deny competent patients the right to refuse treatment with

antipsychotic drugs, competent patients committed under sections 5150 and 5250 of the Act retain that right. Unlike the LPS Act, the SVPA contains no provision granting SVP's the same rights as other persons absent a specific statutory limitation.

"*Riese's* recognition of the right to refuse medication if competent has been codified in the LPS Act, Article 7, in sections 5325.2 and 5332. Section 5325.2 provides that those 'subject to detention pursuant to Section 5150, 5250, 5260, or 5270.15 shall have the right to refuse treatment with antipsychotic medication subject to provisions set forth in this chapter.' Section 5332, subdivision (b) provides that if a person exercises the right to refuse antipsychotic medication, that refusal can only be overridden 'upon a determination of that person's incapacity to refuse the treatment, in a hearing held for that purpose.' " (*In re Qawi, supra,* 32 Cal.4th at p. 18.) Except for patients committed under section 5300 of the LPS Act, this statutory scheme grants competent LPS patients the right to refuse antipsychotic medication in nonemergencies. (At p. 19.) Patients committed under section 5300 are denied this right. (*Ibid.*) "Section 5300, in addition to requiring an assessment of future dangerousness, also requires a finding of recent dangerousness as evidenced by tangible acts or threats of violence." (*Id.,* at p. 24.)

### *MDO's*

■ In *In re Qawi, supra,* 32 Cal.4th at pages 9–10, our Supreme Court held that Penal Code section 2972, subdivision (g), grants MDO's the same right as LPS patients to refuse antipsychotic medication unless they have been found to be dangerous within the meaning of section 5300. Penal Code section 2972, subdivision (g), provides that MDO's who have been civilly committed after their parole period has expired are entitled to the rights of LPS patients set forth in article 7 (commencing with section 5325) of the LPS Act.[16] The Supreme Court reasoned: "The competent LPS patient loses the right to refuse medication only when a statutorily specified showing of dangerousness has been made that includes findings of recent dangerousness . . . . If an MDO could be deprived of the right to refuse unwanted medication by a substantially lesser showing of dangerousness than is required for such deprivation under the LPS Act, then in truth the MDO

---

[16] Penal Code section 2972, subdivision (g), provides: "Except as provided in this subdivision, the person committed shall be considered to be an involuntary mental health patient and he or she shall be entitled to those rights set forth in Article 7 (commencing with Section 5325) of Chapter 2 of Part 1 of Division 5 of the Welfare and Institutions Code. Commencing January 1, 1986, the State Department of Mental Health may adopt regulations to modify those rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held. This subdivision and the regulations adopted pursuant thereto shall become operative on January 1, 1987, except that regulations may be adopted prior to that date."

would not have the same rights as the LPS patient." (*In re Qawi, supra*, 32 Cal.4th at p. 25.) On the other hand, "[i]f an MDO were given the right to refuse medication even if he or she were determined to be dangerous within the meaning of . . . section 5300, . . . then he or she would have a greater right to refuse medication than the LPS patient, contrary to statutory mandate." (*Id.*, at pp. 25–26.)

*SVP's*

The SVPA contains no provision comparable to: (1) Penal Code section 2600, affording state prisoners the right to refuse antipsychotic medication in the absence of compliance with the *Keyhea* injunction; (2) sections 5325.2 and 5332, in the LPS Act, granting competent LPS patients the right to refuse antipsychotic medication unless they have been committed under section 5300; or (3) Penal Code section 2972, subdivision (g), granting MDO's the same rights as LPS patients. The SVPA's omission of such a provision manifests a legislative intent to deny SVP's the statutory right granted to state prisoners, LPS patients, and MDO's to refuse antipsychotic medication. "[I]f a statute on a particular subject omits a particular provision, inclusion of that provision in another related statute indicates an intent the provision is not applicable to the statute from which it was omitted. [Citation.]" (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827 [46 Cal.Rptr.2d 198] ; see also *Hennigan v. United Pacific Ins. Co.* (1975) 53 Cal.App.3d 1, 8 [125 Cal.Rptr. 408] ["The fact that a provision of a statute on a given subject is omitted from other statutes relating to a similar subject is indicative of a different legislative intent for each of the statutes."].)

Furthermore, SVP "statutes are to be interpreted by assuming that the Legislature was aware of the existing law at the time of the enactment of the SVPA. [Citation.]" (*Peters v. Superior Court* (2000) 79 Cal.App.4th 845, 850 [94 Cal.Rptr.2d 350]; see also *People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078] [Legislature "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof"].) The SVPA was enacted in 1995 (Stats. 1995, ch. 763, § 3, p. 5922), nine years after the enactment of Penal Code section 2972, subdivision (g) (Stats. 1986, ch. 858, § 7, p. 2955),[17] four years after the enactment of sections 5325.2 and 5332 (Stats. 1991, ch. 681, §§ 2 & 3, p. 3078), and only one year after the amendment of Penal Code section 2600 incorporating the *Keyhea* injunction. (Stats. 1994, ch. 555, § 1, p. 2821.) It follows that, if the Legislature had intended to grant SVP's the right of state prisoners, LPS patients, and MDO's to refuse antipsychotic medication,

---

[17] The language granting MDO's the rights of LPS patients was originally incorporated in former Penal Code section 2970, subdivision (h), enacted in 1985. (Stats 1985, ch. 1418, § 1, p. 5009.)

it would have expressly done so in the SVPA. In *People v. Superior Court (Ramirez)* (1999) 70 Cal.App.4th 1384, 1391 [83 Cal.Rptr.2d 402], the appellate court invoked a similar rationale: "Since the SVPA was enacted after the MDO Act and the NGI [not guilty by reason of insanity] provisions, the Legislature presumably was aware of the time limits in those provisions. If it had wanted to include similar time limits in the SVPA, it would have done so." (See also *Peters v. Superior Court, supra,* 79 Cal.App.4th at p. 850.)

Our reasoning is consistent with that used by the California Supreme Court in concluding that LPS patients committed under section 5300 are impliedly denied the right to refuse antipsychotic medication. The court noted that section 5300 patients are the only class of LPS patients not expressly granted the right to refuse antipsychotic medication. From this omission, the court inferred that the Legislature must have intended to deny that right to section 5300 patients. (*In re Qawi, supra,* 32 Cal.4th at p. 19.)

### Competent SVP's Do Not Have a Common Law Right to Refuse Antipsychotic Drugs

In *In re Qawi, supra,* 32 Cal.4th 1, 14, 20, our Supreme Court recognized that a competent adult has a common law right to refuse antipsychotic medication. But, as discussed above, the SVPA impliedly denies competent SVP's the right to refuse antipsychotic medication in nonemergencies. "[W]hen modified by state statutes, the common law is inapplicable in California. [Citations.] '. . . The common law is only one of the forms of law and is no more sacred than any other. As a rule of conduct, it may be changed at the will of the [L]egislature, unless prevented by constitutional limitation' [citation] . . . ." (*Lowman v. Stafford* (1964) 226 Cal.App.2d 31, 39 [37 Cal.Rptr. 681]; see also *Ex parte Bagwell* (1938) 26 Cal.App.2d 418, 419–420 [79 P.2d 395].) Petitioners, therefore, did not have a common law right to refuse antipsychotic medication.

### Petitioners Did Not Have a Substantive Due Process Right to Refuse Treatment with Antipsychotic Drugs

Petitioners contend that, under the due process clause of the Fourteenth Amendment of the United States Constitution, a competent SVP has the right to refuse treatment with antipsychotic drugs in the absence of an emergency. The controlling authority on this issue is *Washington v. Harper, supra,* 494 U.S. 210. In *Harper* the United States Supreme Court upheld the constitutionality of a Washington State policy allowing a prison inmate to be involuntarily treated with antipsychotic drugs if he suffers from a mental disorder and

is either gravely disabled or poses a likelihood of serious harm to himself, others, or their property. The policy did not require proof of recent acts of dangerousness to establish "a likelihood of serious harm."[18]

█ The Supreme Court concluded that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment. [Citations.]" (*Washington v. Harper, supra,* 494 U.S. at pp. 221–222.) But the court held that, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (*Id.,* at p. 227.) The court noted that "there is little dispute in the psychiatric profession that proper use of [antipsychotic] drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." (*Id.,* at p. 226, fn. omitted.)

The Supreme Court rejected the contention that the state "may not override [the prisoner's] choice to refuse antispsychotic drugs unless he has been found to be incompetent, and then only if the factfinder makes a substituted judgment that he, if competent, would consent to drug treatment." (*Washington v. Harper, supra,* 494 U.S. at p. 222.) The court reasoned: "The suggested rule takes no account of the legitimate governmental interest in treating him where medically appropriate for the purpose of reducing the danger he poses. A rule that is in no way responsive to the State's legitimate interests is not a proper accommodation, and can be rejected out of hand." (*Id.* at p. 226.)

█ The *Harper* standard should apply to SVP's. Although an SVP is not a prisoner, the state's interest in preventing harm to others and in treating the mentally ill is no less in the SVP setting, with its violent sex offenders, than in the prison environment. In *Morgan v. Rabun* (8th Cir. 1997) 128 F.3d 694, the appellate court applied the *Harper* standard to a person committed to a state hospital after he had been found not guilty " 'on the ground of mental disease or defect excluding responsibility.' " (*Id.,* at p. 695.) The court reasoned: "The governmental interests in running a state mental hospital are

---

[18] The policy defined "likelihood of serious harm" as meaning " 'either: (a) [a] substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others.' [Citation.]" (*Washington v. Harper, supra,* 494 U.S. at p. 216, fn. 3.)

similar in material aspects to that of running a prison. Administrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety. Thus, we apply the *Harper* standard to this case. If Dr. Rabun found Morgan to be a danger to himself or others, then Morgan's substantive due process rights were not violated." (*Id.*, at p. 697.)

An SVP has been judicially determined to be suffering from a mental disorder that renders him dangerous to others. Accordingly, pursuant to *Harper*, the due process clause permits the involuntary medication of a competent SVP with antipsychotic drugs in the absence of an emergency, provided that such treatment is in the SVP's medical interest.

Dr. Paladino determined that the involuntary medication of petitioners with antipsychotic drugs was in their medical interest. She was a psychiatrist familiar with petitioners' disorders and experienced in the treatment of violent sex offenders. As a medical professional, her decision is presumptively valid. " '[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' [Citation.]" (*Youngberg v. Romeo* (1982) 457 U.S. 307, 321 [73 L.Ed.2d 28, 102 S.Ct. 2452].) "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." (*Id.*, at p. 323, fns. omitted.) Dr. Paladino exercised professional judgment in determining that the involuntary medication of petitioners with antipsychotic drugs was in their medical interest. Accordingly, petitioners did not have a substantive due process right to refuse such treatment.[19]

---

[19] Our discussion of the due process issue is limited to a substantive due process analysis. In *Washington v. Harper, supra*, 494 U.S. at p. 220, the Supreme Court observed that the due process issue in that case had "both substantive and procedural aspects." "[T]he substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient." (*Ibid.*) The Supreme Court noted that "[a] State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." (*Id.*, at p. 233.) In their petition for a writ of habeas corpus, petitioners raised only the substantive due process issue. Accordingly, we do not consider whether ASH's involuntary medication policies in 1997–1999 provided sufficient procedural safeguards to comply with due process. The *Harper* court concluded that adequate procedural safeguards existed where a decision by medical professionals to involuntarily medicate was reviewed at a hearing before an independent committee. (*Id.*, at pp. 232–236.) ASH's published policy in 1997–1999 did not provide for such review.

*The Involuntary Medication of Petitioners Did Not Violate*
*Their California Constitutional Right to Privacy*

Petitioners contend that their involuntary medication with antipsychotic drugs violated their California constitutional right to privacy. (Cal. Const., art. I, § 1.)[20] "That right clearly extends to the right to refuse antipsychotic drugs. [Citations.]" (*In re Qawi, supra,* 32 Cal.4th at p. 14.)

"The right to refuse antipsychotic medication is not, however, absolute, but is limited by countervailing state interests." (*In re Qawi, supra,* 32 Cal.4th at p. 15.) One "such countervailing state interest is in institutional security. 'It is . . . well-established that when an individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in preventing the individual from harming himself or others residing or working in the institution.' [Citation.]" (*Id.,* at p. 16.)

 Because of the strong state interest in preventing petitioners from harming others at ASH, petitioners did not have a constitutionally protected privacy interest in refusing appropriate treatment with antipsychotic medication. The medication was administered to control the aggressive, threatening behavior they had recently displayed while confined at ASH. In *Qawi* our Supreme Court concluded that "the forced medication of an LPS patient who repeatedly acts out violently would no doubt be constitutionally justified." (*In re Qawi, supra,* 32 Cal.4th at p. 20.)

Unlike the instant case, the record in *Qawi* failed to show any violent or threatening conduct by Qawi after his commitment as an MDO: "Since [Qawi's] initial placement and treatment as an MDO in 1995, none of the petitions or supporting evaluations identify any specific incidents of violence, threats of violence, or property damage that have occurred." (*In re Qawi, supra,* 32 Cal.4th at p. 11.) "It is not clear from the record whether [Qawi] has engaged in violence or threats within the relevant period." (*Id.,* at p. 28.)

*Equal Protection Principles Require That an SVP Be*
*Provided the Same Right as an MDO to Refuse*
*Antipsychotic Medication*

 Pursuant to the SVPA, a competent SVP may be compelled to take antipsychotic medication without a finding of recent dangerousness within the

---

[20] Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

meaning of section 5300. Such a finding, on the other hand, is a prerequisite to the involuntary medication of a competent MDO. (*In re Qawi, supra,* 32 Cal.4th at pp. 9–10.) We conclude that this classification between SVP's and MDO's violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Equal protection principles require that an SVP be provided with the same right as an MDO to refuse antipsychotic medication.

The MDO Act (Pen. Code, § 2960 et seq.) permits the government to civilly commit certain prisoners to the Department of Mental Health during and after the termination of their parole. The prisoner must have "a severe mental disorder that is not in remission or cannot be kept in remission without treatment." (*Id.,* § 2962, subd. (a).) The disorder must have been "one of the causes of or was an aggravating factor in the commission of a crime for which the prisoner was sentenced to prison." (*Id.,* subd. (b).) The crime must have been a serious or violent felony. (*Id.,* subd. (e).) By reason of the severe mental disorder, the prisoner must "represent[] a substantial danger of physical harm to others." (*Id.,* subd. (d)(1).) A finding of substantial danger "does not require proof of a recent overt act." (*Id.,* subd. (f).) Thus, "a finding of recent dangerousness is not required." (*In re Qawi, supra,* 32 Cal.4th at p. 24.) A Commitment after termination of parole is subject to jury trial and is for a period of one year. (Pen. Code, § 2972, subds. (a) & (c).) The standard of proof is beyond a reasonable doubt. (*Id.,* subd. (a).) Following the initial commitment, a person who continues to meet the MDO criteria may be recommitted for additional one-year periods. (*Id.,* subd. (e).)

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].)

For purposes of the law concerning the right to refuse antipsychotic medication, MDO's and SVP's are similarly situated. Both have been found, beyond a reasonable doubt, to suffer from mental disorders that render them dangerous to others. The dangerous finding requires only an assessment of future dangerousness. It does not require proof of a recent overt act. Both have been convicted of a serious or violent felony. At the end of their prison terms, both have been civilly committed to the Department of Mental Health

for treatment of their disorders. Furthermore, the purpose of the MDO Act and the SVPA is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders. (Pen. Code, § 2960; Stats. 1995, ch. 763, § 1, p. 5921; *In re Qawi, supra,* 32 Cal.4th at p. 9; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20 [81 Cal.Rptr.2d 492, 969 P.2d 584].)

In addition, treatment is mandatory under the MDO Act and the SVPA. In the MDO Act, Penal Code section 2972, subdivision (f), provides: "Any commitment under this article places an affirmative obligation on the treatment facility to provide treatment for the underlying causes of the person's mental disorder." In the SVPA, section 6606, subdivision (a), provides, "A person who is committed under this article shall be provided with programming by the State Department of Mental Health which shall afford the person with treatment for his or her diagnosed mental disorder." Regardless of whether a person is committed as an MDO or an SVP, appropriate treatment may include the administration of antipsychotic medication.

Unlike the SVPA, the MDO Act does not have a mandatory sexual violence component. The SVP must have been convicted of a sexually violent offense against two or more victims, and his mental disorder must make him "a danger to the health and safety of others in that it is likely that he . . . will engage in sexually violent [predatory] criminal behavior." (§ 6600, subd. (a)(1); *People v. Hurtado, supra,* 28 Cal.4th at pp. 1181–1182.) An SVP's propensity to engage in sexual violence may require a treatment regimen different from that for an MDO who does not have such a propensity. But SVP's and MDO's are still similarly situated for purposes of the law concerning the right to refuse antipsychotic medication. Respondent has not referred us to anything in the record or the medical literature indicating that, solely because of the sexual violence component, SVP's generally have a greater need than MDO's for treatment with antipsychotic medication or that such treatment is more effective when administered to SVP's. The need for and efficacy of such treatment will vary depending upon the nature and severity of the patient's mental disorder, irrespective of whether the patient is an SVP or an MDO.

Moreover, some MDO's are sexually violent offenders. Qualifying MDO crimes include sexually violent offenses within the meaning of the SVPA. (See §§ 6600 subd. (b), 6600.1; Pen. Code, § 2962, subd. (e)(2)(F)–(K).) A sex offender who meets all of the criteria of the SVPA, except that his sexually violent offense did not involve two or more victims (§ 6600,

subd. (a)(1)), may qualify for commitment as an MDO.[21] Thus, an MDO may require treatment as a sexually violent offender. Certainly, for treatment purposes, such an MDO is similarly situated to an SVP. Yet, the sexually violent MDO has a statutory right to refuse antipsychotic medication, while the SVP has no such right.

 If similarly situated groups are treated differently under the law and the classification affects a fundamental interest, the classification is subject to strict scrutiny review. (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42 [2 Cal.Rptr.2d 376, 820 P.2d 600]; *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155–1156 [88 Cal.Rptr.2d 696].) The classification between MDO's and SVP's is subject to strict scrutiny review because it affects the fundamental interest of personal liberty. In *Washington v. Harper, supra,* 494 U.S. at pages 221–222, the United States Supreme Court recognized that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs . . . ." In *In re Qawi, supra,* 32 Cal.4th at page 15, footnote 4, our Supreme Court observed that "the coercive administration of [antipsychotic] medication, with its potentially serious side effects, imposes a significant additional burden on the MDO's liberty interest." "[P]ersonal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (*People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].)

"[W]hen reviewing legislative classifications under the equal protection clauses of the California and United States Constitutions, the legislation under examination is generally clothed in a presumption of constitutionality." (*People v. Olivas, supra,* 17 Cal.3d at p. 251.) But "[i]f a classification scheme is subject to strict scrutiny because it affects a fundamental interest, the presumption of constitutionality that would otherwise pertain falls away, the burden shifts, and the state must both establish a compelling interest that justifies the law and also demonstrate that the distinctions drawn by the law are necessary to further that state interest. [Citations.]" (*Pederson v. Superior Court* (2003) 105 Cal.App.4th 931, 941 [130 Cal.Rptr.2d 289]; accord, *People v. Olivas, supra,* 17 Cal.3d at p. 251.)

Respondent has failed to demonstrate a compelling state interest that justifies the distinction between MDO's and SVP's concerning the right to

---

[21] Such a person would not necessarily qualify as an MDO. The MDO Act includes criteria not found in the SVPA. For example, an MDO's "severe mental disorder" must have been "one of the causes of or . . . an aggravating factor" in the commission of a qualifying crime. (Pen. Code, § 2962, subd. (b).) The SVPA, on the other hand, does not require any connection between an SVP's "diagnosed mental disorder" and the "sexually violent offense" of which he was convicted. (§ 6600.)

refuse antipsychotic medication. As discussed above, the distinction cannot be justified merely because, unlike an MDO, an SVP's mental disorder must make it likely that he "will engage in sexually violent [predatory] criminal behavior." (§ 6600, subd. (a)(1); *People v. Hurtado, supra,* 28 Cal.4th at pp. 1181–1182.)

■ Accordingly, in conformity with the *Qawi* holding concerning MDO's, we hold "that an [SVP] can be compelled to be treated with antipsychotic medication under the following nonemergency circumstances: (1) he is determined by a court to be incompetent to refuse medical treatment; (2) [he] is determined by a court to be a danger to others within the meaning of . . . section 5300. An [SVP's] right to refuse such medication may also be limited pursuant to State Department of Mental Health regulations modifying the [SVP's] rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held. A determination that a patient is incompetent to refuse medical treatment, or is dangerous within the meaning of section 5300, may be adjudicated at the time at which he or she is committed or recommitted as an [SVP], or within the commitment period." (*In re Qawi, supra,* 32 Cal.4th at pp. 27–28, fns. omitted.)[22]

■ In *Qawi*, our Supreme Court held "that a court considering whether medication may be involuntarily administered to an MDO should consider whether he or she has committed the types of violent or threatening acts specified in section 5300 within the year prior to the commitment or recommitment." (*In re Qawi, supra,* 32 Cal.4th at p. 28, fn. 7.) The same time limit should apply to an SVP if, at the time of his commitment or recommitment, he is adjudicated to be dangerous within the meaning of section 5300. On the other hand, if such an adjudication occurs within the two-year commitment or recommitment period, the court should consider violent or threatening acts committed within the year prior to the adjudication.

---

[22] The rule which we announce today may result in a departure from the medical standard of care by chilling the ability of medical professionals at ASH to prescribe appropriate antipsychotic medication. As shown by the detailed recitation of facts in this case (*ante,* pp. 1326–1332), those charged with treating SVP's are confronted with a daunting task. It is one thing to read about SVP's in the quiet of appellate chambers and quite another to deal with an obstreperous and violent SVP on the hospital floor. A psychiatrist such as Dr. Paladino, who is experienced in the treatment of violent sex offenders and licensed to prescribe antipsychotic medication, should be able to administer such medication to nonconsenting SVP's without resorting to the courts. (See *Washington v. Harper, supra,* 494 U.S. at p. 231 [ "[A]n inmate's interests are adequately protected, and perhaps better served, by allowing the decision to [involuntarily] medicate [with antipsychotic drugs] to be made by medical professionals rather than a judge."]; *id.* at p. 230, fn. 12 [ "[D]eference . . . is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates . . . and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case."].)

*Disposition*

The petition for writ of habeas corpus is granted solely to the extent that respondent is ordered to refrain from involuntarily administering antipsychotic medication to petitioners in a nonemergency situation unless: (1) petitioners are determined by a court to be incompetent to refuse medical treatment; or (2) petitioners are determined by a court to be a danger to others within the meaning of section 5300; or (3) the involuntary administration of antipsychotic medication is authorized by Department regulations necessary to provide for the reasonable security of ASH. In all other respects, the petition is denied. The order to show cause, having served its purpose, is discharged.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied September 20, 2004.