[No. A028586. First Dist., Div. Five. Mar. 6, 1986.]

CANAL KEYHEA et al., Plaintiffs and Respondents, v.
RUTH RUSHEN et al., Defendants and Appellants.

COUNSEL

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Kristofer Jorstad, Gloria F. DeHart, Ralph M. Johnson, Kenneth C. Young and Bruce M. Slavin, Deputy Attorneys General, for Defendants and Appellants.

Peter E. Sheehan, Clifford C. Sweet and Steven Zieff for Plaintiffs and Respondents.

OPINION

KING, J.—In this case we hold that state prisoners presently have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so.

## I. Introduction

Psychotropic (or antipsychotic) drugs[1] have become a primary tool of public mental health professionals for treating serious mental disorders, replacing such earlier measures as lobotomy, insulin shock, and electroshock. In many patients they minimize or eliminate psychotic symptoms. (Kemna, *Current Status of Institutionalized Mental Health Patients' Right to Refuse Psychotropic Drugs* (1985) 6 J. Legal Med. 107, 109-110 (hereafter cited as *Right to Refuse*); Gelman, *Mental Hospital Drugs, Professionalism, and the Constitution* (1984) 72 Geo. L.J. 1725, 1726, 1741 (hereafter cited as *Mental Hospital Drugs*).) They "also possess a remarkable potential for undermining individual will and self-direction, thereby producing a psychological state of unusual receptiveness to the directions of custodians." (*Mental Hospital Drugs, supra,* at p. 1751.)

The drugs also, however, have many serious side effects. Reversible side effects include akathesia (a distressing urge to move), akinesia (a reduced capacity for spontaneity), pseudo-Parkinsonism (causing retarded muscle movements, masked facial expression, body rigidity, tremor, and a shuffling gait), and various other complications such as muscle spasms, blurred vision, dry mouth, sexual dysfunction, drug-induced mental disorders, and, on rare occasions, sudden death. A potentially permanent side effect of long-term exposure, for which there is no cure, is tardive diskenesia, a neurological disorder manifested by involuntary, rhythmic, and grotesque movements of the face, mouth, tongue, jaw, and extremities. (*Right to Refuse, supra,* at pp. 111-114; *Mental Hospital Drugs, supra,* at pp. 1742-1746.)[2]

At the California Medical Facility at Vacaville (CMF) the decision to administer psychotropic drugs involuntarily on a long term[3] basis is made by the chairman of an institutional review board upon referral by a prison psychiatrist. After an oral presentation by the referring psychiatrist, a review and discussion of the patient's file by the board members, and an interview of the prisoner, the board chairman—a psychiatrist—makes the decision whether to medicate. CMF's internal procedures state that a decision to medicate is reviewed by the board every 90 days. Prisoners are afforded no right to counsel at board hearings and no right to judicial review.

---

[1] These include thorazine, prolixin, stelazine, serentil, quide, tindal, compazine, trilafon, repoise, mellaril, tractan, navane, haldol, moban, and vesprin.

[2] Thus the demeanor often associated with mental illness—shuffling gait, rigid body movements, restlessness, and staring—may be caused by medication rather than by the illness itself. (See Cal. Conservatorships (Cont.Ed.Bar 2d ed. 1983) § 8.50, p. 541.)

[3] At oral argument the parties agreed that "long-term" medication within the context of the issues before us is interpreted as medication in excess of 10 days.

## II. Procedural History

The present case originated in 1977 as a combination individual action by two taxpayers and class action by prisoner Canal Keyhea, arising from CMF's practice of forced psychiatric drugging and Keyhea's transfer from CMF to a state mental health facility. The transfer issue was not asserted by the taxpayers and was eliminated by Keyhea's subsequent dismissal from the action.[4]

The action proceeded as a taxpayers' suit against various state officials (hereafter the State) on involuntary psychiatric medication of prisoners. The pleadings alleged that forced drugging without judicial sanction violates the federal and state Constitutions as well as Penal Code section 2600. Under section 2600 a prisoner may be deprived only of such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (See generally *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 870-871 [183 Cal.Rptr. 866, 647 P.2d 142] [describing legislative transformation of Penal Code section 2600 from civil death statute to prison bill of rights].) In 1982 the trial court bifurcated the statutory and constitutional issues, deferring trial of the latter.

At the trial of the statutory issue the taxpayers presented evidence tending to show that attendance of prisoners at judicial hearings on their competency to refuse treatment would not threaten prison security or public safety within the meaning of Penal Code section 2600.

On July 9, 1984, the court rendered judgment declaring that the State had violated Penal Code section 2600 by subjecting prisoners to long-term involuntary medication without a judicial determination of competency, the assistance of counsel, and a right to personal appearance. The court enjoined the State from subjecting prisoners to long-term involuntary medication without adhering to certain of the procedural requirements contained in specified provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) (hereafter LPS) and the Probate Code.[5] In a statement of

---

[4]In a 1979 unpublished opinion Division Four of this court affirmed the judgment of dismissal as to Keyhea but held the taxpayers had standing to proceed with the remainder of the action. (*Keyhea* v. *Enomoto* (Dec. 21, 1979) 1 Civ. 45908.)

[5]We are not deciding, nor did the trial judge, that all provisions of the LPS statutory scheme apply to prisoners. The judgment specified Welfare and Institutions Code sections 5350 (procedure for one-year conservatorship) and 5358.2 (requiring court order for medical treatment of conservatee) and Probate Code sections 1471 (requiring appointment of legal counsel for Probate Code conservatee) and 1825 (requiring attendance of proposed conservatee at conservatorship hearing). The State argues that the inclusion of section 5350 gives prisoners a right to a jury trial; however, it never sought clarification of this issue from the

decision the court reasoned that nonprisoners have a statutory right to a judicial determination of competency, and deprivation of this right to prisoners was not necessary to protect prison security.

### III. Discussion

A. *Effect of Penal Code section 2600.*

 The State contends preliminarily that the trial court erred by pursuing a prison security analysis under Penal Code section 2600, and that the court's focus should instead have been on the adequacy of existing protections for mentally disordered prisoners. Specifically, the State argues that (1) Penal Code section 2600 protects only constitutional rights and does not encompass any statutory right of nonprisoners to a court determination of competency, and (2) the applicable rule here—affording a fundamental right to give or withhold consent to a proposed psychiatric treatment—requires consideration of the adequacy of existing protection.

The State's proposed adequacy of protection analysis cannot apply, however, because Penal Code section 2600 does indeed protect statutory rights. Section 2600 appears in a statutory scheme entitled "Civil Rights." (Pen. Code, part 3, tit. 1, ch. 3, art. 1.) Section 2600 states the general rule that prisoners retain civil rights other than those rights that would jeopardize prison security or public safety. The other statute in the scheme, Penal Code section 2601, lists specific civil rights that are retained notwithstanding other laws. (In effect the Legislature has predetermined that there is no overriding security interest in infringing the rights listed in section 2601.) Among these enumerated "civil rights" is the *statutory* right to receive workers' compensation benefits under Labor Code sections 3370 and 3371 and Penal Code section 5069. (Pen. Code, § 2601, subd. (i).)[6] This leaves no doubt that the civil rights protected by Penal Code sections 2600 and 2601 include statutory rights. (Cf. Black's Law Dict. (5th ed. 1979) p. 1189, col. 2 [describing "right" as "A power, privilege, or immunity guaranteed under a constitution, statutes or decisional laws . . ."]; see generally *De Lancie* v. *Superior Court, supra,* 31 Cal.3d at p. 874, fn. 8 [Pen. Code, §§ 2600 and 2601 "guarantee that prisoners shall retain *all* rights

---

trial court. We note that the right to a jury trial under section 5350, subdivision (c), was not specifically granted by the trial court in its statement of decision or its judgment. That statutory right is for determination of the issue of whether a proposed conservatee is gravely disabled.

[6]The other rights enumerated in section 2601 are the rights to inherit, own, sell, or convey real or personal property; to correspond with attorneys and public officers; to read printed materials; to have personal visits; to initiate civil actions; to marry; to create a power of appointment; and to make a will. (Pen. Code, § 2601, subds. (a)-(h).)

except to the extent that restrictions are necessary for public safety or institutional security."], italics in original.)

The State argues that section 2600 cannot encompass statutory rights because this would require application of innumerable statutory rights (none of which the State specifically identifies), such as those afforded by the Labor and Education Codes, without any tempering "cost/benefit" analysis. But section 2600, as a prison "bill of rights" (see *In re Harrell* (1970) 2 Cal.3d 675, 698 [87 Cal.Rptr. 504, 470 P.2d 640], cert. den. (1971) 401 U.S. 914 [27 L.Ed.2d 814, 91 S.Ct. 890]), affords civil rights to prisoners absolutely (except where deprivation is necessary to prison security or public safety), without cost/benefit considerations, presumably because of the importance of civil rights in a free society. In any event, the State's nonspecific threat of workers' and students' rights flooding the prison system is meritless; few if any of these rights will have any logical application in a prison setting.

Because Penal Code section 2600 does encompass statutory rights, the "adequate protection" analysis proposed by the State is irrelevant here. The question is indeed whether nonprisoners have a right to a judicial determination of competency before they are administered involuntary long-term psychotropic medication, and, if so, whether denial of this right to prisoners is necessary to prison security or public safety.

B. *Rights of Nonprisoners to Judicial Determination of Competency.*

1. Rights of LPS Conservatees.

The foundation of the trial court's conclusion that nonprisoners have a right to a judicial determination of competency to refuse psychotropic drugs is the court's finding that LPS conservatees have this right by statute. The State attacks this conclusion on two fronts, arguing that (1) the qualified right of LPS conservatees to refuse medical treatment does not extend to psychiatric treatment, and (2) a consent decree in a federal suit concerning involuntary psychotropic medication at Napa State Hospital alone governs the rights of LPS conservatees in this field and does not afford a right to a judicial determination of competency.

a. The scope of LPS.

■ LPS scrupulously protects the rights of involuntarily detained mentally disordered persons. (See Welf. & Inst. Code, §§ 5325, 5327.) The subclass of LPS conservatees is expressly afforded further rights. (Welf. & Inst. Code, § 5357.) Among these further rights is a qualified right to refuse or consent to medical treatment which is (1) related specifically to the con-

servatee's grave disability, or (2) necessary for the treatment of some other existing or continuing medical condition. (Welf. & Inst. Code, § 5357, subds. (d) & (e) [conservatorship investigator's report shall recommend for or against deprivation of certain rights, including right to refuse or consent to medical treatment]; cf. *Board of Regents* v. *Davis* (1975) 14 Cal.3d 33, 42 [120 Cal.Rptr. 407, 533 P.2d 1047] [requirement in section 5357, subdivision (b), of recommendation for or against deprivation of conservatee's right to enter into contracts implicitly recognizes conservatee's right to contract].)

Under the present statutory scheme an LPS conservator can require the conservatee to receive medical treatment, but only if such treatment is authorized in the court order of conservatorship or in a subsequent court order (except in medical emergencies). (Welf. & Inst. Code, §§ 5358, 5358.2.) ■ Accordingly, the Attorney General concluded in a 1977 opinion that under LPS "the conservatee is not divested of the right to make his or her own medical decisions *absent a specific determination by the court that the conservatee cannot make those decisions.* In view of the fundamental nature of the right affected, the court should not make such a determination unless it finds that the conservatee lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment and the attendant risks." (60 Ops.Cal.Atty.Gen. 375, 377 (1977), italics added; see *Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1, 11 [190 Cal.Rptr. 84] [court may suspend conservatee's right to refuse medical treatment and authorize conservator to make informed consent decisions].)

■ The State concedes the right of LPS conservatees to refuse medical treatment absent court authorization, but argues that this right does not extend to treatment of mental illnesses. The State relies on a 1976 letter from a deputy attorney general to a member of the California Assembly, explaining a 1975 Attorney General opinion written by the author of the letter. The 1975 opinion stated that "a conservatee is entitled, as a matter of privacy, to refuse necessary medical treatment absent a specific finding of incompetence or insanity by a superior court of this state . . . ." (58 Ops.Cal.Atty.Gen. 849, 850-851 (1975).) The author stated in the 1976 letter that this opinion was not intended to imply a right to refuse psychiatric treatment.

At the time of the 1975 opinion, however, LPS (specifically section 5357) was "silent on the subject of consent to medical treatment." (58 Ops.Cal.Atty.Gen. 849 (1975).) For this reason the Attorney General's conclusion regarding the right to a judicial determination of competency was expressly founded on a *right of privacy. (Id.,* at p. 850.) In 1976 the relevant provisions of LPS were amended to address the subject of consent to

medical treatment, specifically affording the right to refuse medical treatment absent a court order. (Welf. & Inst. Code, §§ 5357, 5358, 5358.2.)

The right afforded by the 1976 amendment expressly includes the "right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled." (Welf. & Inst. Code, § 5357, subd. (d).) "Grave disability" includes, in pertinent part, "A condition in which a person, as a result of a *mental disorder,* is unable to provide for his basic personal needs for food, clothing, or shelter . . . ." (Welf. & Inst. Code, § 5008, subd. (h)(1), italics added.) Thus by affording a qualified right to refuse treatment related to being gravely disabled, LPS affords a right to refuse psychiatric treatment for the mental disorder causing the grave disability, absent a court order. The 1976 amendment to LPS supersedes the 1975 Attorney General opinion and explanatory 1976 letter. Indeed, the claimed exclusion of a right to refuse treatment for mental illness is conspicuously absent from the 1977 Attorney General opinion, which is based on the amended provisions of LPS. (60 Ops.Cal.Atty.Gen., *supra,* at p. 377.)

In short, the trial court correctly determined that LPS conservatees have a right to refuse involuntary long-term psychotropic medication absent a judicial determination of their incompetency to do so.

b. The effect of the consent decree.

■ The State asserts that the rights of LPS conservatees regarding administration of psychotropic drugs are governed not by statute but by a 1983 consent decree in *Jamison* v. *Farabee* (N.D.Cal., No. 78-0445 WHO), a federal class action on behalf of adult patients at Napa State Hospital. The consent decree contains an agreement by the parties that the involuntary administration of antipsychotic medication to specified patients detained under LPS, including conservatees, violates their federal constitutional rights to due process. In order to protect this constitutional interest the parties agreed that Napa State Hospital would follow specified written procedures for the administration of antipsychotic medication. Under these procedures an "independent reviewer," who is a physician, is empowered to override a patient's refusal. There is no provision for a judicial determination of the patient's competency to refuse medication.

The trial court in the present case correctly held, however, that the consent decree does not address the *statutory* rights of patients detained under LPS. The sole stated purpose of the consent decree is to protect federal constitutional due process rights. The decree amounts to an agreement by the parties that the adopted "independent reviewer" system is adequate to protect those rights, and only those rights. The decree does not purport to

afford such independent review as a method of satisfying the statutory rights afforded by LPS.[7]

Moreover, even if Napa State Hospital patients have given up their statutory rights under LPS in favor of a nonjudicial system of independent review (which is debatable, given the absence of reference to LPS in the consent decree), there has been no such waiver by LPS conservatees statewide. (Cf. *Blue Chip Stamps* v. *Manor Drug Stores* (1975) 421 U.S. 723, 750 [44 L.Ed.2d 539, 557, 95 S.Ct. 1917] [nonparties cannot enforce consent decree even though they were intended beneficiaries].) More broadly speaking, if nonprisoners have a statutory right to a judicial determination of competency to refuse psychotropic drugs, then prisoners cannot be said to have lost this right simply because patients in one mental health institution have agreed to alternative procedures as a method of satisfying their federal due process rights.[8]

2. Rights of Adults Without Conservators.

The trial court expressly declined to rule on the related issue whether adults without conservators have the right to a judicial determination of competency to refuse psychotropic drugs under the provisions of Probate Code section 3200 et seq. [authorization of medical treatment for adults without conservators]. As further support for their position, however, the taxpayers contend that nonprisoners can be subjected to involuntary psychiatric treatment under these statutory provisions, and that such persons have a right to a judicial determination of competency, so that a similar right is available to prisoners under Penal Code section 2600.

Probate Code section 3200 et seq. provide for court authorization of "medical treatment" for an adult who has no conservator but is unable to give informed consent to needed medical treatment. Rendition of a court order requires, inter alia, a probability that a condition, if untreated, "will become life-endangering or result in a serious threat to the physical health of the patient." (Prob. Code, § 3208, subd. (a)(2).) The State and the Department of Mental Health as amicus curiae argue that these statutory pro-

---

[7]The State argues that the plaintiffs' pleadings in *Jamison* asserted there is no right under LPS to a judicial determination of competency to refuse psychotropic drugs. But this assertion by the plaintiffs (which may reflect certain tactical considerations) constituted no more than one side's theory of the litigation. This theory does not appear in the consent decree, and even if it did it would not be stare decisis because there has been no appellate decision. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 763, p. 730.)

[8]If the Legislature decides to adopt an alternative statutory scheme for long-term treatment of prisoners with psychotropic drugs, it will undoubtedly give due consideration to the procedure set forth in the consent decree in *Jamison*.

visions do not encompass treatment for mental illness, and therefore do not authorize long-term involuntary psychotropic medication.

The dispute centers on Probate Code section 3211, which imposes limits on the authorization of medical treatment for adults without conservators. Subdivision (a) of section 3211 states, "No person may be placed in a mental health treatment facility under the provisions of this part." An Assembly committee comment states that section 3211 is "comparable" to Probate Code section 2356. (Legislative Com. com., 54A West's Ann. Prob. Code (1981 ed.) § 3211, p. 593.) Section 2356 imposes limits on the guardianship and conservatorship provisions of the Probate Code. Subdivision (a) of section 2356, like subdivision (a) of section 3211, states that a Probate Code ward or conservatee cannot be involuntarily "placed in a mental health treatment facility." Unlike section 3211, however, subdivision (a) of section 2356 further states that "involuntary civil mental health treatment" can occur only under LPS. The taxpayers in the present case contend that the absence of this latter provision from section 3211 demonstrates legislative intent to permit adults without conservators to be administered any involuntary mental health treatment (upon court order) other than placement in a mental health facility.

The interpretation urged by the taxpayers is logically sound, but there is a more likely explanation for exclusion of the pertinent language from section 3211, demonstrated by examination of two other limits set forth in sections 3211 and 2356.

Subdivision (b) of section 2356 precludes the use of experimental drugs on a ward or conservatee under the pertinent provisions of the Probate Code, and further states that such drugs may be administered only under specified provisions of the Health and Safety Code. Subdivision (b) of section 3211 is a shorter version of its counterpart in section 2356; it precludes the use of experimental drugs under section 3200 et seq., but omits the unnecessary additional language appearing in section 2356.

Likewise, subdivision (c) of section 2356 precludes the use of convulsive treatment on a ward or conservatee under the Probate Code, and also states that such treatment may be performed only under LPS. Subdivision (c) of section 3211 is a shorter version, precluding convulsive treatment but omitting the unnecessary additional language in 2356.

Thus subdivisions (b) and (c) of section 3211 are simply shortened versions of their counterparts in section 2356, abbreviated without substantive change.

Similarly, subdivision (a) of section 2356 precludes placement in a mental health treatment facility under the Probate Code, and contains the further provision that "involuntary civil mental health treatment" may occur only under LPS. Subdivision (a) of section 3211, like subdivisions (b) and (c), precludes placement in a mental health treatment facility under section 3200 et seq. but omits the further provision contained in section 2356. Thus the exclusion of the further language from subdivision (a) appears to be merely a nonsubstantive shortening device, as with subdivisions (b) and (c).

The problem is that, unlike in subdivisions (b) and (c) of section 2356, the further provision in subdivision (a) of that statute refers to "involuntary civil mental health treatment" and thus varies from the prior reference to placement "in a mental health treatment facility." This variance leads to the statutory interpretation urged by the taxpayers.

It seems likely, however, given the nature of subdivisions (b) and (c) of sections 2356, that the two terms in subdivision (a) are carelessly used synonymously, and that, as with subdivisions (b) and (c), the further provision in subdivision (a) is intended simply to state that the proscribed measure is permitted only under other statutory authorization. The Legislature's interchangeable use of the phrases "placed in a mental health treatment facility" and "involuntary civil mental health treatment" can be explained by the fact that involuntary treatment would normally include placement in an institution, since as a practical matter it would be difficult to administer treatment involuntarily without contemporaneous institutionalization.

Leaving aside the comparative structure of sections 2356 and 3211, we cannot believe that the Legislature would take the major step of authorizing involuntary psychiatric treatment for adults without conservators merely by inference to be drawn from the variance between sections 3211 and 2356.

In any event, we need not decide this issue here. First, the trial court's decision was not based on section 3200 et seq., and the injunction did not require adherence to any of those statutory procedures. Assuming the absence of a prison security threat, the right of LPS conservatees to a judicial determination of competency alone supported the judgment.

Second, assuming arguendo that adults without conservators may receive involuntary psychiatric treatment under section 3200 et seq., such treatment clearly can occur only under court order. (Prob. Code, § 3201.) Thus, as it pertains to the present case, this statutory scheme is either completely irrelevant (not authorizing involuntary psychiatric treatment at all) or is further support for requiring a judicial determination of competency (requiring a court order for involuntary treatment).

### 3. Constitutional and Common Law Rights.

■ The taxpayers also argue, and the trial court held, that nonprisoners have a constitutional and common law right to a judicial determination of competency before they can be subjected to involuntary long-term psychotropic medication.

■ It is settled in California that every person has a right to give or withhold informed consent to a proposed medical treatment, under both the state constitutional guarantee of privacy (*Foy* v. *Greenblott, supra,* 141 Cal.App.3d at p. 11) and the common law (*id.; Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242-244 [104 Cal.Rptr. 505, 502 P.2d 1]). No California appellate court, however, has addressed the question whether there is a concomitant constitutional or common law right to a judicial determination of competency before the right to refuse treatment is infringed.

The few cases on this point in other jurisdictions are in conflict.

The federal approach seems to be one of deference to professional judgment. The court in *Rennie* v. *Klein* (3d Cir. 1983) 720 F.2d 266 held that the decision of a mental health professional to administer psychotropic drugs to an involuntarily committed patient "will be presumed valid unless it is shown to be a 'substantial departure from accepted professional judgment, practice or standards.'" (*Id.,* at p. 269, quoting *Youngberg* v. *Romeo* (1982) 457 U.S. 307, 323 [73 L.Ed.2d 28, 42, 102 S.Ct. 2452].) This holding was based on the opinion of the United States Supreme Court in *Youngberg* (not a drug case). *Youngberg* held that under the federal Constitution, in determining whether the state has adequately protected an involuntarily committed patient's rights (specifically to safe conditions of confinement, freedom from bodily restraints, and habilitation), a challenged decision made by a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." (457 U.S. at p. 323 [73 L.Ed.2d at p. 42].)[9]

In contrast, several state courts have held, on constitutional, common law, and statutory grounds, that public mental health professionals cannot forcibly administer psychotropic drugs to involuntarily committed patients without a judicial determination of incompetency to make treatment decisions. (*Goedecke* v. *State, Dept. of Institutions* (Colo. 1979) 603 P.2d 123, 125]

---

[9]For a detailed discussion of the uncertain development of the federal approach, see *Right to Refuse, supra,* at pp. 122-132.)

[based on common law and statute]; *In re K.K.B.* (Okla. 1980) 609 P.2d 747, 751-752 [constitutional right to privacy]; *Rogers* v. *Com'r of Dept. of Mental Health* (1983) 390 Mass. 489 [458 N.E.2d 308, 314] [constitutional right to privacy, common law, and statute]; see *Guardianship of Roe* (1981) 383 Mass. 415 [421 N.E.2d 40, 51, & fn. 9] [guardian of noninstitutionalized mentally ill person cannot consent to forcible administration of antipsychotic medication absent court order; based on constitutional right to privacy, inherent power of courts, and common law].)[10]

▪ We need not decide, however, whether there is a constitutional or common law right to a judicial determination of competency, because that right is provided by statute in California, under LPS. (Cf. *Goedecke* v. *State, Dept. of Institutions, supra,* 603 P.2d at p. 124 [no need to decide constitutional issues because state common law and statute afforded right to judicial hearing on competency].)

As a practical matter, as well as by implication from the statutes authorizing involuntary treatment, no involuntary treatment of any kind can take place outside the confines of the statutory guardianship and conservatorship mechanisms. Wards and conservatees under the Probate Code are expressly protected from involuntary civil mental health treatment. (Prob. Code, § 2356; compare *Guardianship of Roe, supra,* 383 Mass. 415 [421 N.E.2d 40] [noninstitutionalized mentally ill person could receive forcible antipsychotic medication under court order].) Assuming arguendo that adults without conservators may receive involuntary psychiatric treatment under Probate Code section 3200 et seq.—which is doubtful—such treatment clearly can occur only under court order. (Prob. Code, § 3201.) This leaves LPS, which appears to provide the sole mechanism for involuntary administration of long-term psychotropic medication, and also requires a court determination of incompetency.

Thus, regardless of constitutional and common law ramifications, nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so.[11]

---

[10]The requirement of a judicial determination falls within the rubric of "judicial model for factfinding" (see *Parham* v. *J.R.* (1979) 442 U.S. 584, 608, fn. 16 [61 L.Ed.2d 101, 122, 99 S.Ct. 2493]), which one commentator terms the "political charter" (control of state provision of professional services by political processes). (*Mental Hospital Drugs, supra,* at pp. 1730-1731.) This commentator characterizes the rule of deference to professional judgment—the "administrative model"—as the "professional charter" (control of state provision of professional services by professional norms and practices). (*Mental Hospital Drugs, supra,* at pp. 1730-1731.)

[11]In other words, our Legislature has selected the "judicial model" or "political charter." (See *ante,* fn. 10.) Nothing in this opinion should be construed as deciding the issue whether the Legislature can or cannot constitutionally adopt the administrative model for state prisoners.

## C. *Sufficiency of the Evidence.*

■ Having concluded nonprisoners have a statutory right to a judicial determination of competency, our only remaining inquiry under Penal Code section 2600 is whether denial of this right to prisoners is necessary to prison security.[12]

The trial court found that attendance of prisoners at judicial hearings on their competency to refuse treatment with psychotropic drugs would not threaten prison security. This determination was supported by substantial evidence. The transportation sergeant at CMF testified that he could safely transport prisoners to the superior court in Fairfield for competency proceedings. A former CMF custodial officer testified that handcuffs have been sufficient to secure nonobjecting prisoners attending the present institutional review proceedings; belly chains and leg irons have been used if necessary.[13] A former director of Napa State Hospital testified that court hearings for Napa patients did not create any security problems there.

■ ■ ■ Because substantial evidence supported the court's determination that there would be no threat to prison security, that determination cannot be disturbed on appeal.[14]

## IV. Conclusion

■ We conclude that state prisoners, like nonprisoners under the LPS statutory scheme, are entitled to a judicial determination of their competency to refuse treatment before they can be subjected to long-term involuntary psychotropic medication. Mental health professionals and prison administrators may find this requirement cumbersome, but this is a price of life in a free society. Forced drugging is one of the earmarks of the gulag. It should be permitted in state institutions only after adherence to stringent substantive and procedural safeguards.

---

[12]Public safety is not an issue here.

[13]The chairman of the review board testified there is no need at all for chains and handcuffs for the types of prisoners who are "objecting verbally while they hold out their arm to get the shot."

[14]The State also challenges the court's injunction to the extent it afforded certain procedural protections under LPS for persons to be subjected to involuntary medication for more than 14 days, including "the procedural protections provided non-prisoners of notice, judicial hearing, and judicial determination, personal appearance, and assistance of counsel specified in the Lanterman-Petris-Short Act, Welfare and Institutions Code §§ 5350 and 5358.2 and Probate Code §§ 1471 and 1825." The State argues that LPS and Penal Code section 2600 do not compel these procedural protections. But these protections are to be implied from the right to a judicial determination of competency and are a necessary and integral part of that right. To divorce these protections from the right to a court determination of competency would deprive that right of any meaningful significance.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

A petition for a rehearing was denied March 25, 1986, and appellants' petition for review by the Supreme Court was denied July 10, 1986. Lucas, J., was of the opinion that the petition should be granted.