Filed 8/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| Conservatorship of the Person and Estate of D.C. | B290408 |
| LOS ANGELES COUNTY OFFICE OF THE PUBLIC GUARDIAN, as Conservator, etc., | (Los Angeles County Super. Ct. No. ZE042151) |
| Petitioner and Respondent, | |
| v. | |
| D.C., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Harrison, Judge. Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Objector and Appellant.

Mary C. Wickham, County Counsel, Rosanne Wong, Assistant County Counsel, and William C. Sias, Senior Deputy County Counsel, for Petitioner and Respondent.

\* \* \* \* \* \* \* \* \* \*

D.C. appeals the appointment of a conservator under the Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code, § 5000 et seq.) after a jury found her to be gravely disabled due to a mental disorder. She contends the trial court failed to timely advise her of her right to a jury trial and improperly granted a conservatorship without an evidentiary hearing after her counsel submitted on the petition. She also claims the jury trial she received did not cure the prejudice of the denial of her right to an earlier trial; the order that she be medicated without her consent is not supported by substantial evidence; and ineffective assistance of counsel. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 14, 2017, the Los Angeles County Office of the Public Guardian filed a petition for the Appointment of Conservator of the Person and Estate for D.C. In support of the petition, the County filed an application for a Mental Health Conservatorship Investigation, which included a declaration executed by two medical doctors recommending a conservatorship. The doctors declared D.C. had been diagnosed with schizophrenia, was unable to accept voluntary treatment, and a conservatorship was required because D.C. is unable to provide for her personal needs for food, clothing, and shelter.

The report appended to the declaration stated that D.C. suffers from polysubstance abuse disorder, and had been placed on a Welfare and Institutions Code section 5150 psychiatric hold on July 14, 2017, after she threatened to hit her mother and "burn the house down with [her mother] in it." Responding officers saw furniture strewn about the home and holes in the walls. At the psychiatric emergency department, D.C. displayed tangential and disorganized thinking, and was so agitated she had to be sedated.

2

D.C. tested positive for amphetamine, and had a severe lice infestation and scabies.

D.C. was admitted to the psychiatric hospital on July 18, 2017. She suffered from rapid mood swings, could not answer questions, and was seen talking to herself and laughing. It was difficult to treat her extensive lice infestation because she could not understand the need for treatment.

D.C.'s Mental Health Information System report revealed that D.C. had many psychiatric encounters in Los Angeles County, starting in 1996. She had 10 psychiatric hospitalizations from 2010 to 2017. She was hospitalized in August 2015 when she threatened to kill family members, after she stopped taking her psychiatric medications. She was diagnosed with schizophrenia, paranoid type, and had been discharged with antipsychotic mediation.

The report opined that D.C. is gravely disabled due to her psychiatric illness. She needs frequent redirection for self-care, and is unable to communicate in a clear manner. D.C. denied any mental illness or the need for medications.

On August 14, 2017, the trial court appointed the Public Guardian as the temporary conservator, and temporary letters of conservatorship issued that same day.

An initial hearing was set for August 28, 2017. The conservatorship investigator's report was filed that day. According to the report, D.C. denied that she suffered any mental illness or that she was gravely disabled.

D.C. was present in court, and her counsel represented that D.C. would submit on the petition. Counsel "spoke with [D.C.] about the rights, powers, and disabilities involved in the conservatorship, and today she indicated that she's willing to submit."

3

The court found D.C. waived her right to a speedy jury trial. After considering the petition and accompanying reports, the court found D.C. to be "gravely disabled as a result of a mental disorder," granted the petition, and appointed the Public Guardian as conservator of the person and estate. The court imposed legal disabilities upon D.C., including her privilege to operate a motor vehicle, possess a firearm, the right to choose to refuse or consent to treatment related to being gravely disabled or for other medical conditions, and the right to contract.

The order after the August 28 hearing was entered on October 4, 2017, and letters of conservatorship issued that same day. The order included the court's findings in support of divesting D.C. of her right to refuse or consent to psychotropic medication. Those findings were: "The court finds . . . that conservatee is incompetent to give or withhold consent to psychotropic medication pursuant to Welfare and Institutions Code Sections 5350-5368 and 5008(h)(1)(A)." D.C. did not file a notice of appeal from this order.

D.C. was moved to a more restrictive placement on December 4, 2017, based on the recommendation of treatment staff.

On January 16, 2018, D.C. filed a demand for a jury trial. That same day, D.C. also filed a petition for rehearing pursuant to section 5364, which was set for hearing on February 13, 2018.

On February 13, D.C. testified in support of the request for rehearing. According to D.C., she "want[ed] to go home to [her] mom" or her grandmother, however, she had not been in contact with either of them about this plan. D.C. did not agree with her mental health diagnosis, and wanted to be released from the requirement that she take any medications. D.C.'s testimony was difficult to follow and at times nonsensical.

4

The court denied the petition for rehearing, finding that D.C. was still gravely disabled, and the matter was continued for jury trial readiness.

The jury trial commenced on April 23, 2018. D.C.'s testimony was often rambling and disorganized, and did not respond to the questions posed to her.

D.C. testified that she no longer wanted to be under a conservatorship. She planned to stay with her mother, but could not provide specific details about where she would live if released from the conservatorship. When asked whether she agreed with her diagnosis, she testified, "I think I know what they're talking about, but it's—well, I thought it was like when you don't understand you yell, and because I used to see them throughout my window, the guys that would come through the burger stand, and I would shut my window and be yelling, and my mom said maybe you are schizophrenic or something. . . . I says no."

D.C. testified she was currently taking Cymbalta, Ativan, and Gabapentin. She admitted she was not participating in all of the required group sessions at her placement.

Before trial, Forensic Psychologist Gary Freedman-Harvey examined D.C. to form an opinion about whether she was gravely disabled. He relied on some of her medical records in forming his opinion, and met with many of her treatment providers. Dr. Freedman-Harvey opined that D.C. suffers from schizophrenia, auditory hallucinations and paranoia. D.C. displayed cognitive symptoms of her disorder, such as tangential thinking and the inability to answer questions.

D.C. was currently prescribed Haldol, Cymbalta, Neurontin, and Ativan. D.C. would not be able to care for herself without her prescribed medications, and requires supervision to continue taking her medications. D.C. lacks insight about her mental condition.

Dr. Freedman-Harvey opined that D.C. is gravely disabled, and is unable to voluntarily accept meaningful treatment.

At the conclusion of trial, the jury found D.C. to be gravely disabled. On April 25, 2018, the trial court ordered that D.C. was to remain in a conservatorship, that all prior orders were to remain in effect (including the legal disabilities), and that the conservatorship would terminate in August 2018.

D.C. filed a notice of appeal from the April 25, 2018 order.

## DISCUSSION

### 1. Denial of Right to a Timely Jury Trial

D.C. contends the trial court failed to advise her of her right to a jury trial, lacked authority to accept her counsel's submission on the petition without her express consent, and that the belated jury trial did not cure the prejudice to her. D.C. does *not* contend the jury trial was untimely once she demanded one. She also contends her counsel rendered ineffective assistance by failing to object to these deficiencies in the proceedings. Respondent contends D.C.'s failure to timely appeal from the October 4, 2017 order granting the letters of conservatorship bars appellate review. We agree with respondent.

Conservatorship proceedings under the LPS Act are governed by the procedures set forth in the Probate Code. (Welf. & Inst. Code, § 5350.) Code of Civil Procedure section 904.1 provides that an appeal may be taken from an order made appealable under the Probate Code. (Code Civ. Proc., § 904.1, subd. (a)(10).) Probate Code section 1301 provides that "[w]ith respect to guardianships, conservatorships, and other protective proceedings, the grant or refusal to grant the following orders is appealable: [¶] . . . Granting or revoking of letters of guardianship or conservatorship, except letters of temporary guardianship or temporary conservatorship . . . ." (Prob. Code, § 1301, subd. (a).)

6

Here, letters of conservatorship, an order, and findings issued on October 4, 2017, and no appeal from this order was taken. D.C. contends the issues raised on appeal may be reviewed on appeal from the final order continuing the conservatorship following the jury trial. She relies on language in Code of Civil Procedure section 906 which provides that "[u]pon an appeal pursuant to Section 904.1 . . . , the reviewing court may review . . . any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, including, on any appeal from the judgment, any order on motion for a new trial. . . ." However, D.C. ignores the last sentence of section 906, which provides "*[t]he provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken.*" (Italics added.)

Because the October 4, 2017 order was separately appealable, the merits of that order are not reviewable on appeal from the subsequent order. (*Golightly v. Molina* (2014) 229 Cal.App.4th 1501, 1520.)

## 2. Order for Involuntary Medication

D.C. contends the court's October 4, 2017 order for involuntary medication, and the order after the jury trial continuing that order, are not supported by substantial evidence, and that the record does not reflect that the court applied the proper legal standard when making its orders.

As discussed, *ante*, D.C. may not challenge the October 4, 2017 order or the findings included therein. But, to the extent the appeal also challenges the April 25, 2018 order, which again imposed this same legal disability, we will reach the merits of her claim on appeal.

Welfare and Institutions Code section 5005 of the LPS Act provides:  "Unless specifically stated, a person complained against in any petition or proceeding initiated by virtue of the provisions of this part shall not forfeit any legal right or suffer legal disability by reason of the provisions of this part."  Section 5357 sets forth various legal disabilities a conservator may seek to impose, including a limitation on the right to refuse medical treatment. (§ 5357, subd. (d).)  A finding of grave disability alone is not sufficient to justify the imposition of the special disabilities enumerated in section 5357.  (§ 5005; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312-1313 (*Riese*).) The conservatee retains the rights and privileges covered by the special disabilities unless the court, after making a finding of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers the corresponding authority on the conservator.  (*Riese,* at p. 1313.)

"The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal."  (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.)

In the seminal case of *In re Qawi* (2004) 32 Cal.4th 1, our Supreme Court analyzed the findings required under the LPS Act to support an order divesting an individual of the right to refuse or consent to psychotropic medication.  The court adopted the factors set out in *Riese,* and *Keyhea v. Rushen* (1987) 178 Cal.App.3d 526, 535.  It quoted with approval *Keyhea*'s holding that "a court order divesting the conservatee of the right to make his or her own medical decisions cannot be made ' "*absent a specific determination by the court that the conservatee cannot make these decisions*.  In view of the fundamental nature of the right affected, the court

8

should not make such a determination unless it finds that the conservatee lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment, and the attendant risks." ' " (*Qawi,* at p. 18.) "The long-term LPS Act conservatee possesses the right to refuse anti-psychotic medication absent a determination of incompetence." (*Qawi,* at p. 19.)

Here, the court made a finding of incompetence in its October 4, 2017 order. At the subsequent trial, the court determined that "all prior orders remain in place," including the order for involuntary medication. Ample evidence supports these findings and orders. Dr. Freedman-Harvey testified that D.C. lacked insight about her mental condition, is unable to voluntarily accept meaningful treatment, and required medications to treat her schizophrenia. During her testimony, D.C. repeatedly refused to accept her diagnosis. She testified in earlier proceedings that she wished to have the requirement for medication removed. The reports indicated that D.C. had failed to comply with orders for medication in the past, and was unable to provide her consent to treatment for lice and scabies.

We recognize the trial court did not state in its order the specific factors it relied upon in finding by clear and convincing evidence that D.C. was incompetent to give or withhold informed consent. (*Riese, supra,* 209 Cal.App.3d at pp. 1322-1323.) On this record, we find no reversible error. However, in future proceedings, we believe the trial court should state its findings as to the factors set out in *Riese,* so as to leave no doubt the court has adhered to the great value our society places on the autonomy of the individual, and has thoughtfully executed the Legislature's intent to place the forcible administration of powerful psychotropic drugs within the purview of the judiciary, rather than the medical profession. (See *id.* at pp. 1323-1324.)

## DISPOSITION

The April 25, 2018 order is affirmed.


GRIMES, Acting P. J.

WE CONCUR:


STRATTON, J.


WILEY, J.