Filed 11/23/22  Conservatorship of S.H. CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of S.H. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>        Petitioner and Respondent,<br><br>v.<br><br>S.H.,<br><br>        Objector and Appellant. | A163073<br><br>(Contra Costa  County Super. Ct. No. P2000157) |

S.H. appeals from an order reappointing a conservator of his person with the authority to make medical treatment decisions on his behalf pursuant to the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.).[1]  His sole contention is that the evidence is insufficient to support the trial court's finding that he lacks the capacity to give informed consent to treatment.  We affirm.

## BACKGROUND

S.H. suffers from schizoaffective disorder.  In criminal proceedings

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

brought against him in 2018, S.H. was deemed mentally incompetent to stand trial, and the county conservator investigator was ordered to initiate conservator proceedings for him in accordance with the LPS Act. On April 28, 2020, the trial court appointed the Public Guardian of Contra Costa County (Public Guardian) as conservator of S.H.'s person, found him gravely disabled, and empowered the Public Guardian to place him in a locked facility and make medical decisions on his behalf. As that conservatorship period expired, on March 17, 2021, the Public Guardian petitioned to be reappointed as conservator.

S.H. contested the petition and asked for a bench trial, which the court held on June 15, 2021. Two witnesses testified: psychologist and county Deputy Conservator Andrew Smith, Ph.D., an expert in grave disability, and psychologist Jennifer Weinstein, Psy.D., an expert in psychology and grave disability.

Dr. Smith testified first. He was appointed as the conservator of S.H., whom he had known for two and a half months. They had spoken on the phone and met twice, once in March 2021 over Zoom, and another time in May 2021 in person at the secured mental health rehabilitation facility where S.H. was placed. During the two meetings, Dr. Smith assessed S.H. for grave disability.

In Dr. Smith's opinion, S.H. was gravely disabled. The basis of Dr. Smith's opinion was "nuanced," in that while S.H. gave practical responses regarding how he would obtain food, clothing, and shelter if he were out in the community, he "did not have the functionality currently to carry out those plans . . . ." As an example, Dr. Smith observed that although S.H. was able to associate being incarcerated with shelter, this response "gave [Dr. Smith] pause," because prior to his incarceration, S.H. was homeless, "living in a

2

field . . . without a tent, so no real protection from the elements, and he himself had told [Dr. Smith] he wasn't doing well."

Dr. Smith also observed that S.H. exhibited paranoia and blunted emotional affect. When discussing S.H.'s current placement, he was "persistent about wanting to be in an open program," stressing he did not want oversight by others and did not want much in the way of treatment. When asked whether his past or future behavior would affect his ability to maintain placement, S.H. became tense and upset and refused to talk. Similarly, when Dr. Smith asked about S.H.'s insight into the need for medications, he became "surprisingly defensive," stating, " 'I don't wanna talk about that right now. I'll talk about that at the court date. I just don't want too many more questions. I want to keep some things incognito.' " Dr. Smith "use[d] the word paranoid" to describe this reaction, "because it did seem to be beyond and above what reasonable people might talk about in that situation, in that setting, that [he was] his conservator trying to take care of him and make sure his needs are met . . . ."

Counsel asked Dr. Smith whether S.H. had insight into his mental health disorder. Dr. Smith replied that S.H. was able to show appreciation for some of the treatment and services he had been receiving at the facility, such as meals and staff assistance. "At the same time, he seemed to be lacking insight into the fact that [Dr. Smith] was his conservator." Dr. Smith also found S.H. lacked insight into his triggers and emotions in connection with prior aggressive acts. He based this on S.H.'s responses regarding physical altercations that he had with other people at the facility. S.H. attributed one altercation to people "acting weird around him," and another altercation to him having "mania." Dr. Smith found these responses were not "reasonable explanation[s]" for hitting someone. Also, when during the Zoom

3

meeting Dr. Smith brought up a prior sexual offense, S.H. refused to talk, stood up, and ended the meeting.

Dr. Smith opined that S.H. "would not do well in an open program." He believed S.H.'s current placement in a secured facility was appropriate because it provided intensive treatment and was equipped to respond to a person who becomes aggressive. Dr. Smith also had concerns that if he were not conserved, S.H. would not continue his treatment and medications and symptoms would reoccur.

Dr. Weinstein testified next. She interviewed S.H. for grave disability in a 35-to-40-minute meeting over Zoom in late May 2021. After reviewing the conservator's notes, S.H.'s medical records from his facility, and her own interview notes, Dr. Weinstein diagnosed S.H. with schizoaffective disorder, which "includes two diagnoses, a psychotic disorder, such as schizophrenia, and a mood disorder, such as bipolar disorder or depression." The symptoms of the schizophrenia component include thought disorder, perceptual disturbances such as hallucinations or delusions, and paranoia. "These symptoms alter one's ability to differentiate between reality and fantasy and maintain orientation in reality thus impairing decision-making, judgment, planning, and cognition function." The symptoms of the mood disorder component include abruptly changing moods and emotional reactivity, which can also impair decision-making, planning, and judgment.

Dr. Weinstein found that S.H. had "a lack of insight and understanding into the nature of his psychiatric needs." Although he stated he had a mental disorder, he was only able to understand it in "a non-concrete and abstract way." As Dr. Weinstein explained it, "[W]hen I asked about his reasons for detainment or reasons for referred to . . . the current facility, he just stated what happened; . . . I asked many different ways, and he was not able to

4

explain why, what it was that occurred that caused him to require that treatment. He just stated that he was picked up and put in . . . ."

Dr. Weinstein also provided opinions concerning S.H.'s recent physical altercations. Based on her review of S.H.'s records, she found the incidents indicated S.H.'s lack of control over aggressive or angry impulses. Dr. Weinstein described that the altercations stemmed from S.H.'s paranoia or fear that someone was harming him or his belongings and a response that was an impulsive and physically aggressive. She also observed that S.H.'s statements to staff after the altercations showed he did not understand the gravity of the problem or his contribution to the interaction.

S.H. was on two antipsychotic medications, which Dr. Weinstein explained are designed to help reduce paranoid thinking and agitation and improve impulse control. S.H. acknowledged that he took his medication with staff assistance, that the medication " 'keeps [him] from getting violent' " and " 'helps [him] a lot,' " and that he " 'take[s] [his] pills' " when he gets anxiety. However, when Dr. Weinstein asked S.H. about his knowledge of the medications, he refused to continue talking to her.

Dr. Weinstein testified that were S.H. to stop taking his medications, he may experience an increase in his symptoms of paranoia, emotional reactivity, and aggression, which in turn would require a higher level of care. An increase in such symptoms, she explained, could also result in a psychiatric hold or even arrest or jail time.

Like Dr. Smith, Dr. Weinstein concluded that S.H. was gravely disabled. She stated that his lack of insight into his mental disorder prevented him from understanding the nature of his psychiatric needs. As examples, she pointed to S.H.'s 10-year history of homelessness, trouble with emotional reactivity particularly in interactions with other people, his

desired plan to exit the current facility without any psychiatric care or support, and his low engagement in his current rehabilitation program. Dr. Weinstein explained that S.H.'s "psychotic symptoms cause him to have trouble thinking and following through with a rational plan to maintain stability in the community." As such, she did not believe he could rationally advocate for himself in order to obtain his basic needs.

Dr. Weinstein testified that in addition to medication management, meaningful treatment for S.H. included participating in other sections of the rehabilitation program in which he was enrolled, such as group therapy and recreational activities. Another "very important piece of his treatment," she added, was for him to meet one on one with a mental health professional and talk through specific issues, as it would enable him to "reflect or process . . . what happened . . . and plan for a different approach next time . . . ." S.H. struggled in this area, however. Dr. Weinstein pointed out that when she asked S.H. about prior incidents involving aggression, he responded by calling her "a whack job" and walking away from the meeting. This behavior demonstrated not only reactivity and anger, but also an inability to "talk through incidents of aggression" and "to understand further how to better regulate his emotions in the future." Dr. Weinstein added that he was "not quite able to do that yet."

Following that testimony and closing arguments, the trial court announced its decision. It found (1) beyond a reasonable doubt that S.H. remained gravely disabled; (2) by clear and convincing evidence that several disabilities should be imposed, including the right to refuse or consent to medical treatment; and (3) S.H.'s current placement was the least restrictive and most appropriate level of care. On June 30, S.H. filed a notice of appeal.

On July 21, the court issued a written order reappointing the Public

6

Guardian as conservator for the one-year period commencing on April 28, 2021, as well as a letter of conservatorship. The order reiterated the findings made at trial. It also set forth the Public Guardian's duties as conservator. And regarding the medical treatment disability, the court found: "There is clear and convincing evidence that [S.H.] lacks the capacity to refuse or consent to treatment related specifically to [his] being gravely disabled, including psychotropic medications, because [he] is incapable of making rational decisions and lacks the mental capacity to rationally understand the nature of his . . . psychiatric / medical condition, the proposed treatment, and the attendant risks."[2]

## DISCUSSION

### Mootness

As a threshold matter, we must determine whether S.H.'s appeal is moot. The conservatorship that is the subject of this appeal expired on April

---

[2] An order granting a letter of conservatorship is an appealable order. (Prob. Code, § 1301, subd. (a); *Conservatorship of D.C.* (2019) 39 Cal.App.5th 487, 493.) Here, it is unclear which order constitutes the final order for purposes of appeal. Although the court at the June 15 trial made its oral pronouncement and stated, "That will be the order," it issued a minute order that same day, which noted, "Order to follow." Then, on July 21, the court issued a letter of conservatorship and written order, which contained several provisions not included in its June 15 oral pronouncement, such as reappointment of the conservator, the scope of the conservator's duties, and additional findings on the medical treatment disability. To the extent the July 21 order is the final order for purposes of appeal, it appears S.H.'s notice of appeal filed on June 30 was premature. However, we have authority to treat it as filed after entry of the court's July 21 order. (See Cal. Rules of Court, rule 8.104(d)(2) ["The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment"]; see also *id.*, rule 8.104(e) [the word "judgment" under these rules "includes an appealable order if the appeal is from an appealable order"].)

28, 2022, technically mooting this appeal. However, "[b]ecause a conservatorship is relatively brief (one year) in comparison with the appellate process," we will hear this appeal as one raising an issue that "is one capable of recurring, yet of evading review because of mootness." (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5.) We therefore conclude, as have other courts, that it is appropriate to consider the issue in this case. (See, e.g., *Conservatorship of K.P.* (2021) 11 Cal.5th 695, 705, fn. 3; *Conservatorship of G.H.* (2014) 227 Cal.App.4th 1435, 1439–1440; *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 960; *Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 161, fn. 2.)

**The Merits**

Turning to the substance of the appeal, S.H.'s sole contention is that insufficient evidence supports the order limiting his right to refuse or consent to treatment related to his grave disability. We disagree.

A court may establish or renew a conservatorship under the LPS Act if a person is "gravely disabled" (§ 5350), meaning the person, as a result of a mental health disorder, is unable to provide for her or his basic personal needs for food, clothing, or shelter. (§ 5008, subd. (h)(1)(A).) However, a finding of grave disability, by itself, does not justify imposing an order allowing involuntary medical treatment. (See *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 55 (*S.A.*); *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312–1313 (*Riese*); § 5005.) "A competent adult has the right to refuse medical treatment, including the right to refuse psychotropic drugs." (*S.A.*, *supra*, 57 Cal.App.5th at p. 55, citing *In re Qawi* (2004) 32 Cal.4th 1, 14.) Section 5357 sets forth various legal "disabilities" a conservator may seek to impose, including a limitation on "[t]he right to refuse or consent to treatment related specifically to the conservatee's being

8

gravely disabled."  (§ 5357, subd. (d); *S.A.,* at p. 55.)

A court may order involuntary medical treatment if clear and convincing evidence shows the conservatee is incompetent to give or withhold informed consent.  (See *S.A., supra,* 57 Cal.App.5th at p. 55, citing *Riese, supra,* 209 Cal.App.3d at pp. 1322–1323.)  In *In re Qawi, supra,* 32 Cal.4th at pages 17–19, our Supreme Court approved this court's decision in *Riese,* which listed factors a court must consider to determine whether a conservatee is incompetent.  Those factors include "(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes."  (*Riese,* at pp. 1322–1323.)

On review of an order imposing a disability on the right to refuse or consent to treatment, "[w]e must determine whether the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this clear and convincing standard of proof.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1009.)  We do not reweigh evidence.  (*Id.* at p. 1008.)  We presume in favor of the judgment the findings of fact necessary to support it.  (*Conservatorship of George H.*[, *supra,*] 169 Cal.App.4th [at p.] 165].)"  (*S.A., supra,* 57 Cal.App.5th at p. 56.)

Using the factors set forth in *Riese,* we conclude substantial evidence supports the trial court's finding that S.H. was not competent to give

9

informed consent to medical treatment.

While S.H. acknowledged that he had a mental disorder, Dr. Weinstein and Dr. Smith concluded, and S.H. does not dispute, that he lacked insight into the nature of his disorder. For example, when asked about the reasons for being placed in his current facility, S.H. "just stated that he was picked up and put in" and could not explain why. In addition, S.H.'s unreasonable explanations for getting into physical altercations with others at the facility indicated a lack of insight into his triggers and emotions related to aggression. Thus, there was ample evidence that S.H. lacked insight into his mental condition.

Because of this lack of insight, S.H. was distrustful and sometimes hostile to his evaluators, preventing him from confronting his symptoms and participating in a discussion about his psychiatric needs, much less the benefits and risks of specific components of his treatment. During his interviews, S.H. was paranoid, which was symptomatic of his diagnosis. He responded defensively to questions about his impulsive and aggressive behavior, his placement at the facility, and medications. For instance, S.H. refused to respond to what "seemed fairly like a rather simple question" about his insight into the need for medications. Similarly, when asked about his prior acts of aggression, he became tense and refused to continue the discussion. In his meeting with Dr. Weinstein, in particular, S.H. got angry at her, called her "a whack job," and walked away from the meeting. On the topic of his placement at the facility, he pushed for his release and stated he did not want oversight or much in the way of treatment, without providing any explanation on how he would obtain psychiatric support for such a plan. And, as with other topics, he became tense and declined to talk further.

Dr. Smith added that S.H.'s paranoid responses reflected his inability

10

to perceive that Dr. Smith was his conservator, and therefore a person "trying to take care of him and make sure his needs are met . . . ." In a similar vein, Dr. Weinstein added that S.H.'s behavior indicated he was unable to talk with a mental health professional, which is itself a "very important piece of his treatment."

The record therefore demonstrates that due to his lack of insight into his disorder, S.H. could not be expected to be able to understand the benefits and risks of treatment, intelligently evaluate information about treatment, and rationally participate in the treatment decision.

S.H. nonetheless contends the evidence does not support the order imposing the medical treatment disability because there is "no evidence that [he] was at risk of becoming non-compliant with medication or refusing treatment." S.H. also points to evidence that he was able to recognize some of the benefits of his medication. We are not persuaded.

Regarding the first point, S.H. makes much of the fact that he complied with his medications, but he overlooks that medication management, while significant, was but one component of his treatment. And the record discloses he was resistant to other aspects of treatment. Specifically, in addition to medication management, Dr. Weinstein explained, one-on-one talk therapy with a mental health professional was "a very important piece of his treatment." Dr. Weinstein found that S.H. struggled with this, as illustrated by him directing his anger and name calling at her. Other aspects of his treatment included participating in programs provided at the facility, such as group therapy and recreational activities. However, S.H.'s participation in these activities was low. Thus, the evidence indicates that S.H., though compliant with medications, was not receptive to other aspects of his treatment. Indeed, as noted, S.H. expressed to Dr. Smith that he wanted to

leave the facility and did not want much in the way of treatment.

As for S.H.'s second point, it is true that he gave coherent responses to certain questions in his evaluations, such as acknowledgment of the benefits of medications and care at the facility, which were indicative of some level of insight into his situation. At the same time, however, Dr. Smith observed that while S.H.'s responses "superficially look[ed] good on the surface," he exhibited paranoia, blunted emotional affect, and a thought process that "was perhaps not as good as . . . expected." Dr. Weinstein also found that although S.H. was able to identify events that occurred prior to being placed in the facility, he was unable to understand the reasons for his placement and referral to treatment. Dr. Weinstein therefore found that S.H.'s insight into his disorder and psychiatric needs was "minimal." And "if his insight into his needs . . . is minimal," she explained, "then his ability to independently meet his own treatment needs is minimal as well." The record thus permits a finding that although S.H. at times showed a linear thought process, he did not have sufficient mental capacity to make informed decisions about treatment.

In sum and in short, we conclude substantial evidence supports the trial court's finding by clear and convincing evidence that S.H. was not competent to refuse or consent to treatment related to his grave disability.

## DISPOSITION

The order is affirmed.

12

                                        _____

                                        Richman, Acting P. J.

We concur:


_____

Miller, J.


_____

Van Aken, J. *


*Conservatorship of S.H.* (A163073)

     \*Judge of the San Francisco Superior Court, Judge Christine Van Aken, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.